Daniel SPLUDE & Ronald Cargill, Plaintiffs, Appellants,

v.

Kenneth S. APFEL, Social Security Administration Commissioner, Defendant, Appellee.

No. 98–1630.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1998.

Decided Jan. 15, 1999.

Michael A. Bell with whom Jon Holder was on brief for appellants.

Christine N. Kohl, Appellate Staff, Civil Division, with whom Frank W. Hunger, Assistant Attorney General, Jay P. McCloskey, United States Attorney, and Barbara C. Biddle, Appellate Staff, Civil Division, were on brief for appellee.

Before BOUDIN, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOUDIN, Circuit Judge.

It is no accident that Title 42, containing the social security laws among other statutes,

occupies four successive volumes of the United States Code (the Internal Revenue Code requires only two volumes). This case turns on the interplay of statutes establishing two different social security programs and several ancillary provisions. A brief primer will be helpful.

The most familiar social security program is federal old age, survivors and disability insurance, the core provisions of which were adopted as part of the New Deal in 1935. 42 U.S.C. §§ 401–433. It is based on contributions made by employees and their employers to the social security trust fund, and it primarily provides retirement income. But if an insured worker becomes disabled before retirement, scheduled benefits are payable to the employee during disability. *Id.* §§ 401(b), 423. The latter payments are called "social security disability" or "SSD."

In 1972, Congress added a new social security program to provide "supplemental security income" (called "SSI") for "aged, blind and disabled" persons of limited means regardless of their insured status. 42 U.S.C. §§ 1381a, 1382. This is a social welfare program funded out of general taxpayer revenues. SSI is available even to those who qualify for SSD, but SSD income is considered in determining whether a disabled person qualifies for SSI under the latter's means test. *Id.* §§ 1382a(a)(2)(B), (b)(4)(B). A disabled person who qualifies for payments under both programs is called a "concurrent claimant."

This case concerns two concurrent claimants, Daniel Splude and Ronald Cargill. Splude's circumstances are illustrative. He applied in 1992 for both SSD and SSI benefits dating back to 1988. While awaiting a determination of disability by the Social Security Administration (which administers both programs), Splude received relief payments from the Maine Department of Human Services. He signed an agreement with the Social Security Administration authorizing it to deduct from Splude's initial SSI payment that portion of the interim relief provided by Maine that was not itself funded by the federal government.

There is a broad "anti-assignment" law governing SSD payments and applicable to SSI payments by cross-reference, 42 U.S.C. §§ 407(a), 1383(d)(1), reprinted in the appendix to this opinion. However, Splude's 1992 agreement with the Social Security Administration, committing his SSI funds to repay interim state aid, is specifically permitted by a proviso to the cross-referenced statute limiting assignment of SSI payments. *Id.* § 1383(g)(1). This statutory exception does *not* apply to SSD payments; if Splude had attempted to assign his rights to future SSD payments to the Maine agency, the Social Security Administration would not have been allowed to make such a deduction.

In addition to this relationship of federal and state payments, there is a potential interaction between SSD and SSI payments. As already noted, SSD payments due for any month are treated under the SSI means test as income that may reduce or eliminate SSI payments for the same month. One might expect that the Social Security Administration would always make both calculations at the same time, determining SSD payments due to the applicant and then reducing SSI payments to the extent required. But different information is needed for the two calculations (*e.g.*, because SSI is means tested), and SSI is normally computed at field offices and SSD at a central Maryland office.

During the events in this case, the Social Security Administration generally paid out whichever claim was computed first, whether SSI or SSD. Further, an applicant might not apply for disability payments as soon as entitled to do so. Thus, eventually the applicant might receive a large SSI check for back payments; and later, when SSD was calculated, the SSI payment might prove to have been overstated because the SSD payment—made later for the same period—reduced the amount of (means-tested) SSI properly due for the same period.

This overpayment problem was met by the so-called "windfall offset" provisions first added in 1980 and later amended in 1984, 42 U.S.C. § 1320a–6(a), reprinted in the appendix. Under this provision, an excess initial payment for SSI caused by the delay just described can be recaptured by the Social Security Administration by deducting the ex-

cess when the SSD payment is later calculated and ready to be paid. In September 1995, the Social Security Administration abandoned its "pay whichever claim is calculated first" policy and now, we are told, calculates SSI and SSD benefits at the same time so as to avoid any windfall. But the old policy was in effect in April 1993 when the Social Security Administration first found that Splude was disabled and had been for a prior period.

In May 1993, the Social Security Administration advised Splude that he was entitled to $10,659.30 as an initial SSI payment for the period May 1991 through May 1993. After some miscalculations were corrected by cross payment, Maine (in accordance with Splude's agreement) received $7,582 from the Social Security Administration for the interim assistance that Maine had provided to Splude while he was waiting for SSI to be paid, and Splude received the balance of $1,776.

In June 1993, the Social Security Administration calculated Splude's past-due SSD benefits through April 1993. Before any required reductions, this initial payment was computed as $18,706.60. Other deductions aside (e.g., counsel fees), Splude was told that $9,349.57 would be withheld from him because the SSD payment just calculated reduced the initial SSI payment properly due to Splude; in other words, when his initial SSI payment was recalculated to take account of the SSD payment now due for overlapping months, Splude had received $9349.57 too much in SSI—which was now being recaptured for the U.S. Treasury out of his SSD payments under the windfall offset provision.

Splude immediately sought reconsideration. He argued, *inter alia*, that the deduction from his benefits to reimburse Maine and the deduction under the windfall offset statute were both effectively violations of the anti-assignment provision governing SSD. He included also constitutional claims shortly to be described. The Social Security Administration rejected Splude's request for reconsideration. It followed the same course in Cargill's case in which the facts, so far as pertinent, parallel those of Splude's case (including a repayment to Maine for interim aid), and in which the legal claims are also similar.

Splude and Cargill then proceeded before an Administrative Law Judge, and their cases were consolidated. In January 1996, the ALJ issued a decision favoring the claimants as regards the Maine deductions, holding that they should not have been made. The Appeals Council reversed, reinstating the original computations, without deciding the constitutional issues (it said it had no authority to do so). The claimants then sought review in the district court where the cases were assigned to a magistrate judge for a recommended decision.

The magistrate judge, in a decision later adopted by the district court, ruled that the anti-assignment provision governing SSD had not been violated. He said that the "pay whichever claim is ready first" policy did violate equal protection principles but that no remedial action was warranted, in part because the policy had now changed. Accordingly, judgment was entered in favor of the Social Security Administration. The claimants now appeal from the district court's resolution, making us the fifth body to review the original administrative determination.

■ On appeal, we begin with the claimants' statutory arguments, reserving the constitutional issues for later attention. On both levels, the issues are essentially legal, involving interpretations of statutory and constitutional provisions or legal characterizations of events; the raw facts are undisputed. Thus, our review is *de novo*, save as the Social Security Administration's view of the statutes may be entitled to some deference.

The claimants in this case suffered two different deductions pertinent here: one, nominally from their initial SSI payments, was to reimburse Maine; the other, from their later SSD payments, was to reimburse the U.S. Treasury for SSI overpayments found to have occurred after SSD was calculated. The claimants' primary attack is upon the first of these deductions—the payments to Maine—which they say conflict with the provision barring assignment of or levy on social security payments including SSD.

On the surface, the claimants have no argument. The Social Security Administration made a conventional computation of SSI payments due, subject always to recomputation under the windfall offset statute if latter SSD computations showed that too much SSI had been paid. The federal agency then withheld a portion of each claimant's initial SSI payment to reimburse Maine, precisely as provided by the proviso to the anti-assignment statute that approves such withholding from SSI—but not SSD—where a state has advanced relief out of its own funds while the claimant is awaiting federal payments.

One is thus puzzled when, at the outset, the claimants' brief in this court stresses the importance placed by Congress on the anti-assignment provisions, borne out by Congress' amendment in 1983 to reinforce that prohibition,[1] and on precedent including Supreme Court cases protecting social security payments under the anti-assignment provisions from assignments, liens, and other efforts to seize the payments for a variety of otherwise just obligations.[2] After all, whatever the strength of the antiassignment provisions, a proviso explicitly *permits* deductions from SSI to repay interim state assistance.

■ The claimants' argument is stronger than it at first appears. Once unraveled, the contention is not merely that the initial payments to them would have been immune from Maine's reach if SSD had been paid first—a correct statement but one that could be answered by saying, "so what." The argument—put in its strongest form—is that the original SSI payments *were* SSD payments or (since the payments were calculated under the SSI statute and were so intended to be SSI) should be *recharacterized* as SSD payments. This latter is an argument that the government does not directly answer, quite possibly because it did not fully appreciate that it was being made. The argument rests on two pillars.

First, one could view SSD as the unqualified "earned" benefit, resting (at least in theory) on past contributions by or for the claimants, and view SSI as a contingent "welfare" payment whose amount is reduced to the extent that SSD due for the same period pushes the claimant up against the SSI means test. This view has some basis in the statutory framework: SSD is due unconditionally upon disability; SSI, only to the extent that SSD and other income fall short under the SSI means test.

Second, one could point to Congress' strong policy to protect the principal benefit—here, SSD—by an anti-assignment clause *not* qualified (as is SSI) by an exception that allows the state to recapture advances of relief made by the state. This policy, it might then be argued, would be served by insisting that the first payment made be treated as the SSD payment (up to the full amount that would be due if SSD were calculated alone), however the payment might be labeled by the Social Security Administration.

A mathematical expression of the point is suggestive. Here, the government's own calculations show that if the two initial payments due Splude for SSD and SSI had been computed at the same time, most of what was owed would be SSD in the amount of $18,706.60; this would be immune from withholding for Maine's benefit (although other deductions might apply). The balance in SSI payments due Splude, after SSD payments were imputed to his income, would be only $1,883.30. This balance would be subject to a deduction in Maine's favor but this would give Maine far less than the $7,582 it originally advanced to Splude, and Splude's net gain would be substantial.

We decline to recharacterize the transaction. While Congress does have a policy to protect SSD, which might be served in some

---

1. In 1983, Congress added to the anti-assignment provision the further emphatic statement that "[n]o other provision of law ... may be construed to limit, supersede, or otherwise modify the provision of this section except to the extent that it does so by express reference to this section." *See* 42 U.S.C. § 407(b).

2. *See Bennett v. Arkansas*, 485 U.S. 395, 397–98, 108 S.Ct. 1204, 99 L.Ed.2d 455 (1988); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583–90, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979); *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 415–17, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973).

measure by the recharacterization, it also has two other policies: to compensate states that make advances on SSI and to recapture from SSD excessive SSI benefits previously awarded. The recharacterization sought by Splude would result in an immediate loss to the Treasury, contrary to the windfall offset statute, and could in the future discourage interim state aid extended in reliance on repayment from SSI, undercutting the aim of the proviso to the SSI anti-assignment statute.

We have no idea which of its several policies Congress would regard as trumping the other if it faced and resolved the tension, which grows out of the interplay—unanticipated by Congress, one may suppose—of piecemeal amendments and changing administrative practice as to the timing of payments. The sound course for us must thus be not to engage in recharacterizations but to treat the initial payments to claimants here as SSI, in accordance with the intent with which they were made and the statute under which they were actually calculated.

A recharacterization is not required to avoid injustice. Splude got interim state aid, knowing that he would have to pay it back from his SSI, which is just what happened. If SSD had been paid first, he would largely have escaped repayment, but many would regard this as something of a lucky accident or even a windfall. Similarly, Congress explicitly warned that SSD is to be reduced where SSI is overpaid. The result here is not an injustice but merely an anomaly. In a scheme as complex as this one, anomalies cannot always be avoided and are not grounds for a court to rewrite Congress' language.

■ Each of the other circuits to address the issue before us has also supported the government. *See White v. Bowen,* 835 F.2d 974, 978–79 (2d Cir.1987); *McKenzie v. Bowen,* 787 F.2d 1216, 1220–22 (8th Cir.1986). Further, the Social Security Administration is normally accorded the deference due to an agency plausibly interpreting its own governing statutes. *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Our own reading of the statute is thus reinforced, although we would follow it even if other circuits and the agency were silent.

■ It is not clear whether the claimants are also attacking the second deduction as a statutory violation. The claimants' brief could be taken to argue elliptically that the withholding of a portion of the initial SSD payment due each claimant, to reimburse the Treasury for overpaying SSI, was itself prohibited by the anti-assignment statute protecting SSD payments from assignment, levy and the like. The claimants refer to the 1983 amendment already mentioned that warns that "n[o] other provision of law ... may be construed to limit, supersede or otherwise modify [the anti-assignment ban] except to the extent that it does so by express reference to this section." 42 U.S.C. § 407(b).

The first deduction (from the SSI payments to repay state advances) is unaffected by the amendment; the deduction is permitted by a proviso within the SSI anti-assignment provision itself. However, the second deduction (from the SSD payments to recapture SSI overpayments) is premised on another law, the windfall offset provision, which itself makes no reference to the anti-assignment provision. Should we then regard the second deduction as one constituting an assignment, levy, or the like of SSD funds which is authorized but inadequately so because not by a statute that makes "express reference to" the anti-assignment statute?

The most straightforward reading of the windfall offset provision is that what it effects is not any kind of assignment or levy but an internal computation of how much SSD or SSI is due—a computation by which a prior overpayment in either category for the same period is used to reduce what is to be paid in the other category. Further, the windfall offset provision is a specific directive to withhold from SSD an amount needed to recapture excess SSI previously paid; it is hard to think that Congress, in adopting the broad "express reference" amendment to the anti-assignment statute, meant *sub silentio* to repeal its own prior specific directive. Accordingly, we conclude that the second

deduction, from SSD itself, violates no statute.

■ This brings us to claimants' constitutional claims. The first argument, explicitly summarized in the heading of their brief, is that the "backdoor" assignment of their SSD benefits "without notice and an opportunity to be heard" violated the claimants' rights to due process of law under the Fifth Amendment. Claimants rely heavily, in this connection, on *Dionne v. Bouley*, 757 F.2d 1344 (1st Cir.1985).

Cast as a claim that procedural rights were wrongly denied, the argument makes no sense. Both deductions—from SSI for Maine and from SSD for the Treasury—were computations made in the course of determining what the Social Security Administration should remit to the claimants. The government was hardly obliged to pay out moneys before initially determining what was due. Thereafter, plaintiffs point to nothing procedurally inadequate about the process afforded to them to show that they were entitled to more than the government paid them.

The objections claimants raise to the deductions are substantive (*i.e.*, they do not like the result), but that is not a problem of notice or opportunity to object. *Dionne* is wholly distinguishable. In that case, a judgment creditor secured an attachment on the debtor's bank account, primarily containing social security payments exempt from attachment. This court agreed with the debtor that Rhode Island procedure was deficient in failing to provide the debtor, post-attachment, with notice and a prompt opportunity to remove the attachment based upon the federal anti-attachment provision governing Social Security payments.

So far as the claimants are making an argument based on substantive due process or takings law, as some of their other citations suggest, the answer is a different one. Social security benefits like SSD have been regarded in some contexts as "property" for constitutional purposes. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (continued receipt of social security disability checks). But this case requires no exploration of the circumstances in which such a property interest can be limited or qualified.

Here, the deduction from SSI for the benefit of Maine, agreed to by the claimants, was part of a transaction that effectively advanced a portion of their SSI welfare benefits; the claimants got the full amount due, some of it paid earlier for their own benefit. Conversely, the reduction of SSD to account for an overpayment of SSI, effected under the windfall offset statute, recaptures for the government SSI payments to which the claimant was never entitled. In neither case did the deduction comprise a taking or other wrongful interference with a property interest.

■ The final argument made by the claimants is that the then-practice of the Social Security Administration of paying first whichever benefit was first calculated violates equal protection principles. As noted above, one who gets paid SSD first may end up effectively avoiding repayment of some or all of a state advance; one who gets paid SSI first may end up repaying all of the advances. The claimants say that the (now-superseded) payment policy was irrational discrimination because it created two classes of similarly situated persons who receive different benefits based on the accident of which payment occurred first.

■ The federal government is not directly governed by the equal protection clause, which appears only in the Fourteenth Amendment, but the Supreme Court has held that equal protection principles are implicit in the Fifth Amendment's due process clause. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The magistrate judge agreed with the claimants that the former payment policy did violate equal protection principles. He then withheld relief on grounds that we need not describe, because we find no such violation.

In reaching this conclusion, we reject at the outset the government's contention that claimants' equal protection claim fails merely because there is no charge of "purposeful discrimination" by the Social Security Administration, that is to say, a subjective in-

tent to favor one group or disfavor another on impermissible grounds. In certain kinds of cases—*e.g.*, those involving *ad hoc* actions or those involving merely an adverse impact on an individual group—lack of such an invidious purpose may be fatal to the claim. *See, e.g., Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ However, any "classification" by the government, even if made without any wrongful or suspect purpose, is required under equal protection principles to meet a minimum requirement of rationality. *See Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981); *Baker v. City of Concord,* 916 F.2d 744, 747 (1st Cir. 1990). The former practice of the Social Security Administration to pay whichever claim was computed first might be regarded as creating a classification since it was a deliberate, ongoing policy that did predictably, although innocently, create two groups of claimants enjoying different net benefits. The difficulty for Splude and Cargill is that the test of rationality is extremely generous to the government in social and economic matters, *see Baker,* 916 F.2d at 747, and a policy that seeks to get payments out as soon as they are ready is not irrational. Delaying payments until both SSI and SSD are computed doubtless threatens hardships of its own. That a particular classification scheme, otherwise rational, will produce occasional aberrant outcomes is something that the Constitution is taken to tolerate.

*Affirmed.*

## STATUTORY APPENDIX

42 U.S.C. § 407. Assignment; amendment of section

(a) The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

(b) No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section.

42 U.S.C. § 1320a–6. Adjustments in SSI benefits on account of retroactive benefits under subchapter II

(a) Reduction in benefits

Notwithstanding any other provision of this chapter, in any case where an individual—

(1) is entitled to benefits under subchapter II of this chapter that were not paid in the months in which they were regularly due; and

(2) is an individual or eligible spouse eligible for supplemental security income benefits for one or more months in which the benefits referred to in clause (1) were regularly due,

then any benefits under subchapter II of this chapter that were regularly due in such month or months, or supplemental security income benefits for such month or months, which are due but have not been paid to such individual or eligible spouse shall be reduced by an amount equal to so much of the supplemental security income benefits, whether or not paid retroactively, as would not have been paid or would not be paid with respect to such individual or spouse if he had received such benefits under subchapter II of this chapter in the month or months in which they were regularly due. A benefit under subchapter II of this chapter shall not be reduced pursuant to the preceding sentence to the extent that any amount of such benefit would not otherwise be available for payment in full of the maximum fee which may be recovered from such benefit by an attorney pursuant to section subsection (a)(4) or (b) of section 406 of this title.

(b) "Supplemental security income benefits" defined

For purposes of this section, the term "supplemental security income benefits" means benefits paid or payable by the Commissioner of Social Security under subchapter XVI of this chapter, including State supplementary payments under an agreement pursuant to section 1382e(a) of

this title or an administration agreement under section 212(b) of Public Law 93–66.

(c) Reimbursement of the State

From the amount of the reduction made under subsection (a) of this section, the Commissioner of Social Security shall reimburse the State on behalf of which supplementary payments were made for the amount (if any) by which such State's expenditures on account of such supplementary payments for the month or months involved exceeded the expenditures which the State would have made (for such month or months) if the individual had received the benefits under subchapter II of this chapter at the times they were regularly due. An amount equal to the portion of such reduction remaining after reimbursement of the State under the preceding sentence shall be covered into the general fund of the Treasury.

42 U.S.C. § 1383(d). Procedures applicable; prohibition on assignment of payments; representation of claimants

(1) The provisions of section 407 of this title and subsections (a), (d), and (e) of section 405 of this title shall apply with respect to this part to the same extent as they apply in the case of subchapter II of this chapter.

42 U.S.C. § 1383(g). Reimbursement to States for interim assistance payments

(1) Notwithstanding subsection (d)(1) of this section and subsection (b) of this section as it relates to the payment of less than the correct amount of benefits, the Commissioner of Social Security may, upon written authorization by an individual, withhold benefits due with respect to that individual and may pay to a State (or a political subdivision thereof if agreed to by the Commissioner of Social Security and the State) from the benefits withheld an amount sufficient to reimburse the State (or political subdivision) for interim assistance furnished on behalf of the individual by the State (or political subdivision).