NATIONAL EDUCATION ASSOCIA-TION–RHODE ISLAND, By Its Secretary, Tia SCIGULINSKY, Et Al., Plaintiffs, Appellees/Cross–Appellants,

v.

RETIREMENT BOARD OF THE RHODE ISLAND EMPLOYEES' RETIREMENT SYSTEM, Et Al., Defendants, Appellants/Cross–Appellees.

Richard R. DeOrsey, Plaintiff, Appellant.

Nos. 98–1763, 98–1782.

United States Court of Appeals, First Circuit.

Heard Feb. 1, 1999.

Decided March 24, 1999.

Joan McPhee and Neil F.X. Kelly, Special Assistant Attorney General, with whom John C. Bartenstein, Richard S. Weitzel, Ropes & Gray, Thomas A. Palombo, Special Assistant Attorney General, and Jeffrey B. Pine, Attorney General, were on brief for defendants Nancy Mayer and Retirement Board of the Employees' Retirement System of the State of Rhode Island and Joann Flaminio in her capacity as Executive Director.

Robert H. Chanin with whom John M. West, Jonathan D. Hacker, Bredhoff & Kaiser, P.L.L.C., Thomas J. Ligouri, Jr., Richard A. Skolnick and Skolnick, McIntyre & Tate were on brief for plaintiffs National Education Association–Rhode Island, et al.

Marc B. Gursky with whom Gursky Law Associates was on brief for plaintiff Richard R. Deorsey.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and SHADUR,* Senior District Judge.

* Of the Northern District of Illinois, sitting by designation.

BOUDIN, Circuit Judge.

In 1936, Rhode Island created a retirement system for state employees, school teachers, and other employees of cities and towns that chose to participate. R.I. Gen. Laws §§ 36–8–1 to 36–10–39. The retirement system is administered by the Retirement Board ("the Board"), which is chaired by the state treasurer. R.I. Gen. Laws §§ 36–8–4, 36–8–9. The retirement system is a "defined benefit plan" in which benefits are determined not by the amount contributed during service but by a schedule of benefits that specifies the amount to be paid.

At present, benefits under the Rhode Island statute are set as a percentage of the average of the employee's salary earned during the three highest consecutive years of earnings, multiplied by the number of years of credited service. R.I. Gen. Laws § 36–10–10. An employee may retire and begin receiving payments at any age after 28 years of service or after reaching age 60 and completing 10 years of service. Id. § 36–10–9. Employees contribute a fixed percentage of annual earnings to the retirement system, but the state pays the balance needed to provide the scheduled benefit. Id. § 36–10–2.

In the 1980s, teachers' unions in Rhode Island sought legislation to allow employees of unions representing state employees including teachers to participate in the state retirement system; these union employees are not, at least in that capacity, public employees. Thus, the statute needed to be amended to permit them to receive benefits. In early 1987, a bill embodying such a proposal was introduced and placed on the legislature's consent calendar; and it was passed on the final day of the session without debate and apparently without much public notice.

The new provision, codified at R.I. Gen. Laws § 36–9–33, not only allowed union employees to join the retirement system, but also permitted them to purchase credit, on payment of a modest amount to the system, for all years previously served with the union.[1] This allowed the union employee to treat all prior years of employment by the union as years of public service needed to qualify for state pension benefits *and* to treat earnings from the union as if they were public compensation for purposes of computing the "highest three (3) consecutive years" average. *Id.* § 36–10–10.

Furthermore, the provision allowed union employees to receive pension benefits based on salaries over which the state had no control. Because the retirement system calculates benefits based on the average of the three highest consecutive years' salary (multiplied by a factor based on years of service), the *union* could raise salaries for pension-qualifying union employees and thereby boost their pension benefits from the state retirement system. The record reflects significant increases in union employee salaries following the passage of section 36–9–33.[2]

The effect, as more fully described below, was to allow a number of highly paid union officials to qualify for state pensions almost immediately in amounts greatly in excess of their contributions to the system. The pensions were in addition to, not in place of, whatever pensions were provided by the union. The district court later calculated the plaintiffs' total contribution to the Retirement System at $1,995,784, the present value of their projected pension benefits at about $11,430,579, and an aver-

---

1. The amount required for each year of credit was 10 percent of the union employee's *starting* salary. *See* R.I. Gen. laws § 36–9–33. By contrast, the benefit to be provided—as for state employees—was to be computed on the three highest consecutive years' average. *Id.* § 36–10–10.

2. For example, Edward Casey earned a salary of $45,794.48 in 1987, $47,528.71 in 1988 and $50,645.40 in 1989. After he joined the state system, his union salary jumped to $59,-965.61 (1990), then to $72,122.07 (1991), finally to $80,000 in the year he retired (1992).

age projected rate of return for the individual plaintiffs of approximately 1250 percent.

When the situation became widely known, the legislature repealed section 36–9–33 *in toto* on June 9, 1988. *See* 1988 R.I. Pub. Laws ch. 486 ("the Repeal Act"). At that time, applications by union employees were pending before the Board, which had declined to process them. Despite the repeal, two teachers' unions filed suit in October 1988 and later succeeded in persuading a state court judge that the repeal was prospective only and did not permit the Board to exclude union employees who had sought to become members and purchase credits prior to the repeal. *See RIFT v. Retirement Sys.*, No. PC 88–4974 (R.I. Sup.Ct. Dec. 21, 1989).

As a result, qualified union employees then entered the retirement system, some retiring fairly soon after. Bernard Singleton, for example, became a member of the Retirement System effective January 1, 1990 (as did other individual plaintiffs) and promptly purchased roughly 25 years of service credit for his prior union employment at a cost of $25,411.09. On July 28, 1990, several months later, at age 52, he took "early retirement" and immediately began to collect a pension of approximately $53,000 per year, with an expected lifetime benefit of about $750,000.[3]

In July 1994, the legislature responded by "evicting" the union employees. *See* 1994 R.I. Pub. Laws ch. 413, § 1, codified at R.I. Gen. Laws § 36–9.1–1 *et seq.* ("the Eviction Act"). The new statute, which sparked the present litigation, terminated pensions for union employees who had entered under the now repealed statute. It provided for return of their contributions, with interest, reduced by any benefits they

had received. *Id.* The Eviction Act stated that inclusion of union employees had "no rational relationship to any legitimate governmental purpose" and would invade the corpus in violation of the requirements of the Internal Revenue Code. *Id.* § 36–9.1–1.

Two teachers' unions and 22 present or former union employees then brought the present suit in the district court in July 1994 against the Board, its chairperson, and its executive director. The plaintiffs alleged that the Eviction Act violated the Contract, Takings and Due Process Clauses of the Constitution, *see* U.S. Const. art. I, § 10, cl. 1; *id.* amend. V; *id.* amend. XIV, and that under 42 U.S.C. § 1983, they were entitled to declaratory relief, an injunction, restoration of any benefits wrongly withheld, and attorney's fees.

The district court denied the defendants' motion to dismiss. *See National Educ. Ass'n–R.I. v. Retirement Bd.*, 890 F.Supp. 1143, 1165 (D.R.I.1995) ("*NEA I*"). Following discovery and cross motions for summary judgment, the district court decided the heart of the case in a detailed and lucid opinion on August 7, 1997. *See National Educ. Ass'n–R.I. v. Retirement Bd. of R.I. Employees' Retirement Sys.*, 972 F.Supp. 100 (D.R.I.1997) ("*NEA II*"). The decision resolved all legal issues but reserved for later disposition a few factual questions as to the status of three individual plaintiffs.

In a nutshell, the district court ruled that the Takings Clause protected the benefits of two groups of plaintiffs: those who were eligible to retire and had retired by the date of the Eviction Act (July 15, 1994), and those who were eligible to retire but were still working as of that date.[4]

---

**3.** This was not a unique case. For example, Bernard Connerton contributed $27,072.88 and then retired in July 1990 at age 53 with an expected benefit close to $640,000. Edward Casey contributed $28,351.69 and then retired in December 1992 at age 56 with an expected benefit of more than $650,000. Ronald DiOrio contributed $23,452 and then

retired in July 1990 at the age of 50 with an expected benefit in excess of $500,000. Edward McElroy contributed $34,385.50 and then retired in November 1992 at age 51 with an expected benefit of approximately $550,000.

**4.** *See NEA II*, 972 F.Supp. at 115–16. Eligibility was primarily equated with the 28–

Three other plaintiffs who were still working and were not eligible for retirement at the date of the Eviction Act were held not protected by the Takings Clause or by the Contract Clause or by substantive due process concepts. *See id.* at 114–15.

Given these legal rulings, the parties then stipulated as to the status of two of the other remaining plaintiffs—one was eligible to retire and therefore protected and the other was not—leaving only one plaintiff (DeOrsey) whose status was contested. In April 1998, the district court conducted a bench trial and ruled that DeOrsey had never been eligible to join the retirement system. Thereafter, the district court entered a final judgment in favor of the eligible plaintiffs and against the ineligible ones. The defendants now appeal from the first part of the judgment, and the ineligible plaintiffs, together with DeOrsey, from the second.

 On appeal, our review is *de novo* as to the legal issues resolved on summary judgment, *see Terry v. Bayer Corp.*, 145 F.3d 28, 34 (1st Cir.1998), and for clear error as to the factual issues resolved at DeOrsey's bench trial. *See Williams v. Poulos*, 11 F.3d 271, 278 (1st Cir.1993). We begin with the plaintiffs' Contract Clause claims, if only because most of the precedent addresses such cases under this rubric. The claims raise a difficult set of issues that were expressly reserved in this court's leading decision in *McGrath v. Rhode Island Retirement Board*, 88 F.3d 12 (1st Cir.1996), further complicated by the somewhat eccentric facts of this case.

Pension plans come in all sorts of shapes and sizes but the typical plan contemplates a stream of payments to be received by the employee starting upon retirement; both the terms and the payment formula are normally stated in the plan. In defined benefit plans, such as that of Rhode Island, the employee may be required to contribute during employment; but much of the payout is contributed by the employer, often funded in advance at least in part. *See generally* 1 J. Mamorsky, *Employee Benefits Law: ERISA and Beyond* §§ 1.01–1.05, at 1–2 to 1–25 (1998).

Although such plans may be negotiated as explicit contracts (*e.g.*, as part of a collective bargaining agreement), quite often they are simply "plans." The plans may or may not have language binding the employer not to change them (at least in certain circumstances) or reserving its right to do so (at least in certain circumstances). Often, such plans have "vesting" provisions,[5] but strictly speaking such provisions usually describe how the existing plan operates and not whether the plan itself can be altered unilaterally by the employer. "Vesting" and "contractual" are not synonymous.

In *McGrath*, this court surveyed the case law and concluded that with respect to *private* pension plans, the courts were divided, but that a substantial body of case law treats such plans as implied contracts, protecting at least those whose rights have "vested." *McGrath*, 88 F.3d at 16–17. The theory is that the plan is an offer and the employee, by working for many years pursuant to the plan, has relied on and accepted the offer, which cannot now be changed unilaterally as to a vested employee, whether still working or retired. *Id.* at 17. Of course, the plan may still explicitly

years-of-employment or age–60–and–10–years-of-employment requirement of the retirement plan; a few of the retired plaintiffs were included as eligible, even though they had retired early, because state law so permitted. *Id.* at 113–14.

5. Typically, the pension "vests" after the employee has worked for a specific period (in Rhode Island the period is 10 years, *see* R.I. Gen. Laws, § 36–10–11), and then the employee receives a pension—at the retirement age—even if he leaves state employment and works elsewhere until retirement. However, an employee who leaves immediately after vesting but before retirement will likely get a lower pension than an employee who works for the state until retirement. *See* R.I. Gen. Laws § 36–10–10.

reserve rights to alter vested benefits.[6]

The case law concerning *public*-employee pensions is less settled. Some courts, including this one, have been quite hesitant to infer a contract where the state pension statute neither speaks in the language of contract nor explicitly precludes amendment of the plan. *See, e.g., Parker,* 123 F.3d at 5–6. After all, legislatures regularly modify compensation schedules and benefit programs. Supreme Court precedent has tended to treat government pension statutes as similarly subject to modification for payments not yet made, unless the government's intent to create a contract is clear and definite. *See, e.g., Dodge v. Board of Educ.,* 302 U.S. 74, 78–79, 58 S.Ct. 98, 82 L.Ed. 57 (1937).

■ Thus,

absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' *Dodge v. Board of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937).... [T]he principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state.... Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not *clearly and unequivocally expressed*

would be to limit drastically the essential powers of a legislative body.

*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (emphasis added).

■ Although *National Railroad* involved a claim that federal statute created contractual rights,[7] the *Dodge* case cited by the Court with approval in *National Railroad* involved a state pension statute for teachers; and in *Dodge* the Court explicitly held that a reduction in pensions for already retired teachers did not violate the Contract Clause. *See Dodge,* 302 U.S. at 81, 58 S.Ct. 98. More recently, the Supreme Court allowed a statutory reduction in railroad worker pensions for some "vested" workers, noting that "railroad benefits, like social security benefits, are not contractual and may be altered...." *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 173, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (citations omitted).

The clear statement requirement for "legislative" contracts has been regularly imposed by the Supreme Court and followed by this court.[8] The policy reasons for protecting legislative power against implied surrender are too obvious to warrant much elaboration, *see National Railroad,* 470 U.S. at 466, 105 S.Ct. 1441; *McGrath,* 88 F.3d at 19, and it is easy enough for a statute explicitly to authorize a contract or to say explicitly that the benefits are con-

---

6. *See McGrath,* 88 F.3d at 14, 20 (noting statutory language reserving right to amend plan); *City of Charleston v. Public Serv. Comm'n,* 57 F.3d 385, 393–95 (4th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 474, 133 L.Ed.2d 404 (1995) (same); *National Ass'n of Gov't Employees v. Commonwealth,* 419 Mass. 448, 646 N.E.2d 106, 110 (1995), *cert. denied,* 515 U.S. 1161, 115 S.Ct. 2615, 132 L.Ed.2d 858 (1995) (same).

7. Strictly speaking, the Contract Clause does not govern acts of the United States, *see United States v. Winstar Corp.,* 518 U.S. 839, 876, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), but similar principles have been said to apply to the federal government, and *National Rail-*

*road* itself addresses Contract Clause-based arguments on their own terms with regard to the federal statute, *National Railroad,* 470 U.S. at 469–70, 105 S.Ct. 1441.

8. *See National Railroad,* 470 U.S. at 465–66, 105 S.Ct. 1441; *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17–18 & n. 14, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Dodge,* 302 U.S. at 78–79, 58 S.Ct. 98; *Rhode Island Laborers' Dist. Council v. Rhode Island,* 145 F.3d 42, 44 (1st Cir.1998); *cf. Parker v. Wakelin,* 123 F.3d 1, 5–6 (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998); *McGrath,* 88 F.3d at 19; *Hoffman v. City of Warwick,* 909 F.2d 608, 614 (1st Cir. 1990).

tractual promises,[9] or that any changes will not apply to a specific class of beneficiaries (*e.g.,* those who have retired), *cf. Parker,* 123 F.3d at 8–9.

■ We do not think that the Rhode Island general pension statute "clearly and unequivocally" *contracts* for future benefits either by language or—in the circumstances of this case—through the nature of the relationship. Nowhere does the statute call the pension plan a "contract" or contain an anti-retroactivity clause as to future changes. *Compare Brand,* 303 U.S. at 105, 58 S.Ct. 443. The closest that the statute comes is a provision headed "Guaranty by state—Annual appropriations" which provides, *inter alia,* that

> it is the intention of the state to make payment of the annuities, benefits, and retirement allowances provided for under the provisions of this chapter and ... to make the appropriations required by the state to meet its obligations to the extent provided in this chapter. The general assembly shall make annual appropriations which shall be sufficient to provide for the payment of annuities, benefits, and retirement allowances required of the state under this chapter.

R.I. Gen. Laws § 36–10–7. This certainly directs state officials to fund the plan as it exists. But it falls at least a step short of clearly expressing a contractual commitment not to change benefit levels or other plan variables by legislation. *Compare Parker,* 123 F.3d at 8–9.

Nor we do think that references in the statute to "vesting" create a contract. Often, and clearly so in Rhode Island's statute, "vesting" refers to the period provided by a plan for which an employee must work to become eligible for a pension if and when he attains retirement age. *See* note 5, above. Whether a plan affords contractual protections against a change in its terms is a different question. A plan may not protect "vested" employees against change, *see Fritz,* 449 U.S. at 169 n. 3, 173–74, 101 S.Ct. 453, or alternatively may provide some contractual protection even for unvested employees (*e.g.,* against a change in the vesting period), *cf. State of Nevada Employees Ass'n, Inc. v. Keating,* 903 F.2d 1223, 1226–27 (9th Cir.1990).

If one turns from language to circumstances, *see United States Trust,* 431 U.S. at 17 n. 14, 97 S.Ct. 1505, it is true that *today* private pensions are often conceived and crafted more as deferred compensation than as gifts. *See Parker,* 123 F.3d at 6–8; *McGrath,* 88 F.3d at 16–19. But pensions can still be created (and withdrawn) without contract; this was just what the Supreme Court found as to railroad retirement benefits in *Fritz* itself. *See Fritz,* 449 U.S. at 174, 101 S.Ct. 453; *see also Hisquierdo v. Hisquierdo,* 439 U.S. 572, 575, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). Further, Rhode Island's general pension plan was created in 1936 when the view of pensions taken in *Dodge* was quite widespread.

■ Rhode Island case law points in both directions. The state supreme court has implied that under state law pensions cannot be freely terminated; but it has also allowed cut-offs (of, for example, a faithless judge) not easily reconciled with a strict contract theory. *See In re Almeida,* 611 A.2d 1375 (R.I.1992). In all events, whether a contract exists for Contract Clause purposes is a federal question. *See General Motors Corp. v. Romein,* 503 U.S. 181, 187, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992).

The existence of an employer-employee relationship does weigh in favor of finding an implied contract, as the non-governmental pension cases make clear. *See McGrath,* 88 F.3d at 17 (summarizing case

---

**9.** *See Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 105, 58 S.Ct. 443, 82 L.Ed. 685 (1938) (holding act "couched in terms of contract" and using contractual language gave rise to Contract Clause claim under teacher employment statute); *United States Trust,* 431 U.S. at 18, 97 S.Ct. 1505. ("The intent to make a contract is clear from the statutory language.").

law). However, the force of this consideration is very much muted in this case: these particular plaintiffs do not have the benefit of a clear and longstanding employer-employee relationship *with the government*—they are far from the quintessential 10 or 28–years–of–service government employees.

We decline to decide now whether this last consideration would tip the balance if, for example, Rhode Island took a meat axe to the pensions of long-time state employees. In many states, there are express limitations on such changes; and in general, political constraints make them unlikely (but not impossible).[10] In all events, the clear statement rule is binding unless and until altered by the Supreme Court, *see State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 284, 139 L.Ed.2d 199 (1997); and the conundrum of a "statutory" contract that may meet this requirement by clear implication rather than clear language is an issue happily deferred.

We turn now to the basis given by the district court for granting relief, namely, that the future payments constituted a property right that could not be infringed without payment of compensation to retirees or employees eligible to retire. In *McGrath*, we explicitly reserved decision on this issue, *see McGrath*, 88 F.3d at 20 n. 9, finding that the pension expectancies at issue had not even vested at the time that they were modified by the legislature. Here, the issue can no longer be fully postponed.

■ The Fifth Amendment forbids the federal government from taking "property" for public use without just compensation, and this limitation has been extended to the states through the Fourteenth Amendment. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160,

101 S.Ct. 446, 66 L.Ed.2d 358 (1980). What constitutes "property" for this purpose is a recurring issue to which no mechanical answer has been found. The concept includes more than tangible property owned outright, *see United States v. Willow River Power Co.*, 324 U.S. 499, 502–03, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), and has been extended to materialmen's liens, *see Armstrong v. United States*, 364 U.S. 40, 44, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), and trade secrets protected under state law, *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

■ But the Supreme Court has also made clear that protection under the Takings Clause does not extend to mere "unilateral expectation[s]," even if they are entirely plausible expectations of economic benefit. *Webb's Fabulous Pharmacies*, 449 U.S. at 161, 101 S.Ct. 446; *cf. Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 2161–63, 141 L.Ed.2d 451 (1998) (Breyer, J., dissenting). Thus, the Supreme Court has excluded from the "property" rubric riparian rights recognized under state law, railroad pensions, and future social service benefits. *Willow River*, 324 U.S. at 502–03, 65 S.Ct. 761 (riparian rights); *Hisquierdo*, 439 U.S. at 575, 99 S.Ct. 802 (railroad pensions); *Flemming v. Nestor*, 363 U.S. 603, 608–611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (social security). This is so even though expectations are sometimes afforded procedural protection, *see, e.g., Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and protection from wholly arbitrary action, *see Fritz*, 449 U.S. at 172, 101 S.Ct. 453. *See* R. Rotunda & J. Nowak, 2 *Constitutional Law: Substance and Procedure* § 15.12, at 485 n.4, § 17.5,

---

10. A number of states have explicit constitutional protections against "retroactive" changes in pension benefits; and in at least one other protects such benefits by statute. *See* D. Simko, "Of Public Pensions, State Constitutional Contract Protection, and Fiscal

Constraint," 69 Temple L.Rev. 1059, 1060 & n.13 (1996). *Compare Winstar*, 518 U.S. at 878–83, 116 S.Ct. 2432 (suggesting some limits on application of "unmistakability" doctrine to *express* government contracts) (plurality opinion of Souter, J.).

at 626 (2d ed.1992).[11]

In the present case, the Takings Clause does, or arguably does, to some extent protect *some* interests of plaintiffs under the pension plan. Pension payments actually made to retirees become their property and are protected against takings, even if and where the payments are unquestionably a gift. Similarly, anything that the employee contributed, directly or by purchase of benefits, may well be regarded as the employee's property. Under the Rhode Island plan, contributions are returned with interest even to a non-vested employee who leaves the state's employment. *See* R.I. Gen. Laws § 36–10–8. However, the Eviction Act did not purport to reclaim any benefits actually paid, and it provided for the return of any member contributions, with interest, to the extent that they exceeded already paid-out benefits. *See* R.I. Gen. Laws §§ 36–9.1–2(a), (b).

■■■ Thus, the question for us is whether, apart from what has been paid in by the member or already paid out by the state, the prospective payments of the state's share of the defined benefits are currently "property" of the plaintiffs under the Takings Clause. If there were a contractual right to such payment, that right itself would be property for the purposes of the Takings Clause. *See United States Trust,* 431 U.S. at 11 n. 16, 97 S.Ct. 1505. But in this case we have already said that the state's prospective payments, over and above the members' contributions, are not contractually obligated under the Contract Clause—at least as to "last minute" entrants such as the plaintiffs.

In *Hoffman,* we concluded that "[n]oncontractual employee benefits that a recipient has not yet received, but has a mere expectation of receiving, are not property

as to which the government, before repealing, must provide just compensation." *Hoffman,* 909 F.2d at 616. There we denied a Contract Clause claim because a pension statute did not clearly indicate an intent to bind the legislature contractually, *see id.* at 614, and then denied a Takings Clause claim because there was no enforceable contract right, *see id.* at 616; *cf. Fritz,* 449 U.S. at 174, 101 S.Ct. 453. That decision is controlling here.

This position is virtually compelled by Supreme Court cases that, after finding that an expected statutory benefit did not constitute a contract right, rejected the claim to payment. *See, e.g., National Railroad,* 470 U.S. at 466–67, 478–79, 105 S.Ct. 1441; *Flemming,* 363 U.S. at 610–11, 80 S.Ct. 1367; *Dodge,* 302 U.S. at 78–81, 58 S.Ct. 98. It would make nonsense of such rulings—and the clear intent requirement—to conclude that an expectancy insufficient to constitute an enforceable contract against the state could simply be renamed "property" and enforced as a promise through the back door under the Takings Clause.

■■■ This brings us to the final constitutional attack on the Eviction Act: the claim that it violates "substantive" due process. An expectation that is not "property" for purposes of the Takings Clause may yet sometimes entitle the citizen to procedural protection, and substantive protection against arbitrariness, before the expectation is cut off by government action. *See Flemming,* 363 U.S. at 610–11, 80 S.Ct. 1367; *Hoffman,* 909 F.2d at 618. The plaintiffs' claim here is to substantive protection (no procedural rights have been denied), but the due process standard in economic matters is one of minimum rationality. *See Usery v. Turner Elkhorn*

11. A further confusion arises because the phrase "investment-backed expectations" is sometimes used in the cases in quite a different way: to decide—*after* a property right is found to exist (*e.g.,* land ownership)—whether a particular invasion by the government—*e.g.,* an infringement on air rights—constitutes a compensable taking of something one reasonably invested in when making the purchase. *See Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *see also Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

*Mining Co.,* 428 U.S. 1, 17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Hoffman,* 909 F.2d at 618.

When Congress curtailed pension rights of certain vested railroad employees to prevent windfall benefits, it made fairly mechanical judgments about who should be grandfathered into double pensions and who should not, and the Supreme Court upheld those judgments. *See Fritz,* 449 U.S. at 174, 179–80, 101 S.Ct. 453. Similarly, we only recently upheld against such an attack certain distinctions made by Congress in social security payments to limit duplicative recovery, even while recognizing that the restrictions involved some fairly gross distinctions that could hardly be described as perfect justice. *See Splude v. Apfel,* 165 F.3d 85, 92 (1st Cir. 1999).

Here, the class of persons who have been "evicted" are individuals who were never public employees—at least in the capacity for which the state pensions are sought—and were permitted to enter the system at bargain-basement prices while retaining their pensions as union employees. The discrepancies between what they contributed as a class and what they might expect in pensions was striking. And almost at once, they were warned of legislative efforts to undo their unusual benefits. The first such attempt (the Repeal Act) was frustrated in state court, but the Eviction Act followed hard on its heels.

At argument, plaintiffs' counsel pointed out that the legislature has in the past given special pension benefits to favored groups, allowing (for example) veterans to "purchase" years of credit. *Cf. McGrath,* 88 F.3d at 13 (describing R.I. Gen. Laws §§ 45–21–9, 45–21–53). But especially in economic regulation, the question is not whether the legislature has dealt perfectly with all possible problems but whether its choice in this instance was rational. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Fritz,* 449 U.S. at 176–77, 101 S.Ct. 453; *Hoffman,*

909 F.2d at 618. Here, the choice to evict this group of members, returning to them their contributions with interest, is not so patently arbitrary, irrational, or unrelated to a legitimate legislative purpose as to constitute a violation of substantive due process.

Our resolution makes it unnecessary to discuss whether the additional plaintiffs, to whom the district court denied relief, were "eligible" or bona fide members of the plan. It reserves, once again, the very difficult case of the long-time vested or eligible employee whose benefits might be curtailed. And it leaves it open to Rhode Island and its employees to address such matters by explicit legislation or ordinary contract, the course best suited to achieve certainty on both sides.

The decision of the district court is *vacated* and the matter is *remanded* for entry of a judgment dismissing the complaint.

*It is so ordered.*