## RHODE ISLAND BROTHERHOOD OF CORRECTIONAL OFFICERS, Plaintiff,

v.

State of RHODE ISLAND; Lincoln Almond in his capacity as Chief Executive Officer of the State of Rhode Island; Robert L. Carl, Jr., in his capacity as Director of the Department of Administration of the State of Rhode Island; Paul J. Tavares, in

his capacity as General Treasurer of the State of Rhode Island; and Ashbel T. Wall, II, in his capacity as the Director of the Department of Corrections of the State of Rhode Island, Defendants.

C.A. No. 02–50L.

United States District Court, D. Rhode Island.

May 28, 2003.

Gerard Paul Cobleigh, Cobleigh, Sprague & Giacobbe, Warwick, RI, Dennis T. Grieco, II, Gidley, Sarli & Marusak, Providence, RI, for plaintiff.

Thomas A. Palombo, Assistant Attorney General, Providence, RI, Claire J.V. Richards, Office of the Governor, Providence, RI, John L.P. Breguet, Department of Administration, Office of Labor Relations, Providence, RI, for defendants.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

Plaintiff filed this action against defendants for damages and injunctive relief pursuant to 28 U.S.C. §§ 1331 and 1343 (2000) as well as 42 U.S.C. §§ 1983 and 1988 (2000). Plaintiff alleges federal and state substantive due process and Takings Clause violations as well as state claims for breach of contract, promissory estoppel and unjust enrichment/quantum meruit.

In 1976, Rhode Island enacted a statutory educational incentive pay program for state correctional officers which permitted

the officers to receive additional percentage-based compensation for attaining a specified number of educational credits. The collective bargaining agreement ("CBA") between plaintiff and the State also adopted the statutory pay program and its percentage-based salary formula. The CBA expired on June 30, 1996, and on July 1, 1996, an amendment to the Incentive Pay Statute went into effect replacing the percentage-based formula with a sum certain pay increment.

This matter is before the Court on defendants' motion to dismiss all counts of the complaint for failure to state a claim upon which relief can be granted. After careful consideration, defendants' motion is granted on all counts, and the complaint hereby is dismissed.

I.   Background

Rhode Island Brotherhood of Correctional Officers ("plaintiff"), the union for state correctional officers, brought this action on January 22, 2002 alleging six counts against the State of Rhode Island as well as Lincoln Almond, as Governor, Robert L. Carl, Jr., as Director of the Department of Administration, Paul J. Tavares, as General Treasurer, and Ashbel T. Wall II, as Director of the Department of Corrections.   Plaintiff also invokes this Court's pendent and ancillary jurisdiction to assert state law claims.

Counts I and IV allege federal and state contract claims.   Counts II and III allege a denial of substantive due process and a violation of the Takings Clause.   Counts V and VI allege promissory estoppel and unjust enrichment/quantum meruit claims respectively.   Plaintiff seeks injunctive relief, compensatory damages plus attorneys' fees and costs in addition to a declaration that the 1996 Amendment to the Correctional Officers Pay Plan ("Incentive Pay

Statute") violates the Federal and State Constitutions.

In 1976, Rhode Island enacted the Incentive Pay Statute.   1976 R.I. Pub.L. ch. 290 § 2 (codified as R.I. Gen. Laws § 42–56.1–1 *et seq.*).   The Incentive Pay Statute required the State of Rhode Island to pay educational incentive funds to full time correctional officers once those officers had acquired a specified number of educational credits.   Once the requisite credits had been attained, the correctional officers were required to remain employed by the Department of Corrections for varying lengths of time as stipulated by the Incentive Pay Statute.   The statute also required that the individuals who accepted the additional statutory compensation forego receiving any other educational incentive payments that would otherwise be available to them as state employees.   The funds which a correctional officer received under the program were calculated as a specified percentage of the officer's base salary depending upon the number of educational credits the officer had earned.

The State, through its administrative officials, entered into collective bargaining agreements with plaintiff over the years in which it agreed to pay the educational incentive funds as described by the Incentive Pay Statute.   In accordance with earlier agreements, the most recent CBA adopted the percentage-based formula set forth in the statute and also required the officers to remain employed for specified periods of time after attaining the requisite number of educational credits.

In 1996, the Rhode Island General Assembly enacted an Amendment to the Incentive Pay Statute, effective as of July 1, 1996.   The Amendment stated that correctional officers would no longer receive educational incentive pay according to the percentage-based formula but would instead

receive a specified sum in addition to base pay.

On March 22, 2002, defendants filed a motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint against them for failure to state a claim upon which relief can be granted. Plaintiff objected to the motion and a hearing was scheduled on the matter.

Thereafter, on October 22, 2002, this Court held a hearing on the motion to dismiss. At the conclusion of the hearing the Court took the matter under advisement. The parties have briefed the federal and state issues at length and the matter is now in order for decision.

## II. Discussion

### Jurisdiction

■ Plaintiff filed this action pursuant to this Court's federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 1983 and 1988. The only basis for federal jurisdiction is § 1983 in this case. Consequently, there is subject matter jurisdiction. Furthermore, a district court's original jurisdiction over federal questions enables the court to consider state law claims in conjunction with federal claims when they "derive from a common nucleus of operative fact" such that the entire action is but one constitutional case. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also* 28 U.S.C. § 1367(a)(providing that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in

the action ... that they form part of the same case or controversy."). Since the state law claims are intertwined with the federal claims asserted under § 1983, the Court will rule on all the claims being made in the six counts.

Under § 1983, it is clear that a claim for compensatory damages cannot be maintained. The doctrine of sovereign immunity is a well-established common law doctrine that prohibits a party from suing a state in its own courts for alleged deprivations of civil liberties without the state's consent. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In *Will*, the Supreme Court concluded that Congress did not intend to bypass this doctrine upon enacting § 1983. *Id.* Thus, the Court specifically held that "a State is not a person within the meaning of § 1983."[1] *Id.* at 64, 109 S.Ct. 2304. This Court recognizes that § 1983 often provides a litigant with a federal forum in which the party can seek redress for deprivations of his or her civil liberties, but § 1983 does not permit a litigant to seek a remedy against a state for those same deprivations. *Id.* at 66, 109 S.Ct. 2304. The Eleventh Amendment bars litigants from pursuing this type of suit unless the state has waived its immunity or unless Congress has exercised its power under the Fourteenth Amendment to override that immunity. *Id.* As Congress had no desire to undermine the States' immunity by enacting § 1983, and as there is no evidence that Rhode Island has waived it, plaintiff cannot maintain a suit for compensatory damages against the State of Rhode Island.

---

1. Section 1983 provides in relevant part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ...

to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

■ Plaintiff also brought suit under § 1983 against defendants, Lincoln Almond, Robert L. Carl, Jr., Paul J. Taveres and Ashbel T. Wall, II in their official capacities as state officials. As the Supreme Court established in *Will*, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office". *Id.* at 71, 109 S.Ct. 2304. Consequently, the Court concluded that, under those circumstances, a suit against a state official is no different from one against the State itself. *Id.* Although this writer recognizes that state officials acting in their official capacities can be sued for prospective injunctive relief pursuant to § 1983, plaintiff cannot maintain a suit for compensatory damages against the individually named defendants in their official capacities. *Id.* at n. 10.

*Standard of Review*

Defendants brought this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). In ruling on a motion to dismiss, the Court construes the complaint in the light most favorable to plaintiff, taking all well-pleaded allegations as true and giving plaintiff the benefit of all reasonable inferences. *See Figueroa v. Rivera*, 147 F.3d 77, 80 (1st Cir.1998). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

This Court recognizes that consideration of documents which have neither been attached to the complaint nor expressly incorporated therein should ordinarily not be considered in deciding a motion to dismiss. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). Normally, a court's consideration of such documents will convert a motion to dismiss into a motion for summary judgment under Fed.R.Civ.P. 56.[2] *Id.* Nevertheless, this writer notes that narrow exceptions to this rule exist. One such exception permits this Court to take into account facts set forth in documents which plaintiff has referenced in the complaint and that are essential to plaintiff's claims, such as the alleged individual contracts and the CBA in this case. *Id.; see* Compl. ¶ 12–13.

*The Contract Claims*

Plaintiff alleges in Count I of the complaint a violation of the Contract Clause of the United States and Rhode Island Constitutions.[3] Plaintiff also asserts a state law breach of contract claim in Count IV.

Although the Contract Clause of the United States Constitution was originally intended to protect only private contracts, the Clause is now frequently applied to public contracts between states and private parties. *Perry v. State of R.I.*, 975 F.Supp. 418, 423 (D.R.I.1997), *aff'd* 145 F.3d 42 (1st Cir.1998). As the present matter involves an alleged contract between plaintiff and the State of Rhode Island, the Contract Clause applies.

Under Contract Clause analysis, a court must first determine whether a contract

---

2. If on a motion to dismiss for failure to state a claim upon which relief can be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." Fed.R.Civ.P. 12(b).

3. The Contracts Clause of the United States Constitution states in relevant part that "no state shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Rhode Island's provision provides comparable protection. R.I. Const. art. I, § 2.

exists.[4] *Id.* If a contract has been formed, the court must then consider whether the statute in question impairs an obligation under that contract. *Id.* Next, if the law impairs a contractual right, the court must consider whether the impairment is substantial. *Id.* Finally, the court must determine whether the substantial impairment is reasonable and necessary in order to further an important public purpose. *Id.* When a state is a party to an alleged contract and the impairment was caused by a change in state law, a court must be extra vigilant in assessing the reasonableness and necessity of that impairment. *McGrath v. Rhode Island Ret. Bd.*, 88 F.3d 12, 16 (1st Cir.1996). Nevertheless, the First Circuit has noted that although less deference is bestowed upon a state when the state seeks to rid itself of a contractual obligation, there must be a "clear showing" that the legislature intended to create a contractual obligation in the first place. *Parker v. Wakelin*, 123 F.3d 1, 5 (1st Cir.1997).

As both Count I and Count IV require this Court to determine whether a contract was formed between the parties, this writer will consider these Counts together.

## A. *Bilateral Contract Formation*

■ Plaintiff contends that a bilateral contract was formed, because plaintiff's Members promised to "obtain specified education credits, remain employed by the Department of Corrections for specified lengths of time and to forego receiving or obtaining any other educational incentive payments otherwise available to them as state employees, in exchange for and in consideration of the percentage based edu-

cational benefits." (Pl. Obj. Mot. to Dismiss at 10.) Plaintiff's bilateral contract argument, however, is fatally flawed.

Precedent clearly dictates that mutuality of obligation is the cornerstone of a bilateral contract. *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir.1994). The First Circuit has specifically stated that "[t]o show mutuality of obligation, both parties must ... [be] legally bound through the making of reciprocal promises." *Id.* at 7–8. In short, a bilateral contract requires an exchange of promises which establishes rights and duties on the part of each contracting party. *Midwest Precision Services, Inc. v. PTM Industries*, 887 F.2d 1128, 1132 (1st Cir. 1989). Consequently, when an agreement lacks a definite obligation on the part of one party, there is insufficient consideration to constitute a valid and enforceable bilateral contract. *Brightwater Paper Co. v. Monadnock Paper Mills*, 161 F.2d 869, 871 (1st Cir.1947).

In the present case, the Members of the Rhode Island Brotherhood of Correctional Officers never promised to do anything. Nothing in the language of the statute nor in the alleged individual contracts required any Member to enroll in any educational course. The statute and alleged contracts simply state that "any full time correctional officer employed by the department of corrections ... *shall be eligible* for the plan ... provided he accumulates the requisite number of points under the schedule ... and provided ... that such eligible member agree in writing to remain as an eligible staff member of said department of corrections for the length of time as specified." R.I. Gen. Laws § 42–56.1–2

---

**4.** The Rhode Island Contract Clause has been interpreted to provide the same protection as the Contract Clause under Article I, § 10, cl.1 of the United States Constitution. The Rhode Island Supreme Court utilizes the test devised by the United States Supreme Court in analyzing alleged Contract Clause violations. *Retired Adjunct Professors v. Almond*, 690 A.2d 1342, 1345 n. 2 (R.I.1997).

(emphasis added); (Mem. Supp. Mot. to Dismiss at Ex. B.) *See also* CBA, art. XXXVIII. Thus, the statute merely provides that if an officer enrolls in certain specified courses and accumulates the requisite number of points, the officer will receive an increase in pay. *Id.* Consequently, the correctional officers did not enter into a bilateral contract with the State of Rhode Island. Whether the officers entered into a unilateral contract with the State, however, is a more complex question. It is to this issue that this Court now turns.

### B. *Unilateral Contract Formation and the Unmistakability Doctrine*

■ Cases involving pension plans have provided the framework for determining whether a legislature intended for a state to enter into a public contract. In addition, *Perry,* a case involving comparable educational incentive pay legislation for Rhode Island state court clerks, is particularly instructive as the language of the statute closely mirrors that of the statute at issue in the present case. Thus, this Court will examine the analysis and holdings in both the pension plan cases and the court clerks' case in order to determine whether the Rhode Island General Assembly intended to form a public contract between the State and its correctional officers as a matter of federal constitutional law.

Historically, noncontributory pension plans were viewed as gratuities or bounties. *McGrath,* 88 F.3d at 16. Modern legal doctrine, however, tends to view pension plans as unilateral contracts that form part of a compensation package which employers use to attract and retain qualified employees. *Id.* at 16–17. A unilateral contract "consists of a promise made by one party in exchange for the performance of another party, and the promisor be-

comes bound in contract when the promisee performs the bargained for act." *Nat'l Educ. Ass'n—R.I. v. Ret. Bd. of R.I. Employees' Ret. Sys.,* 890 F.Supp. 1143, 1157 (D.R.I.1995) ("*NEA I*"). In *McGrath,* the First Circuit held that upon fulfilling the service requirements entitling the employee to the plan's retirement benefits, the employee "acquires a contractual right to those benefits, and the employer cannot abridge that right despite its . . . reservation of a power to effect unilateral amendments or to terminate the plan outright." 88 F.3d at 18–19. The circuit explained in *McGrath,* however, that the case law which had previously discussed whether a legislature can reserve the power to amend or revoke a pension plan had involved *private* sector retirement plans. *Id.* at 19. Although the alleged contract at issue in *McGrath* involved a municipal employee's retirement plan, the First Circuit refused to answer the question of whether a contractual obligation exists once an employee's rights vest under a *public* sector plan, because the employee's rights in *McGrath* had not vested. *Id.* The First Circuit, therefore, simply denied the municipal employee relief by holding that a member's right to retirement benefits are not secure until the employee meets the age and service requirements stipulated in the plan. *Id.* at 20. Consequently, the question of whether a contractual obligation is formed between the State and its employee under a public retirement plan once the employee's rights have vested remained an open question after *McGrath.*

The First Circuit addressed that unanswered question in *Parker.* For purposes of the case at bar, *Parker* is particularly noteworthy for two reasons. First, unlike the municipal employee in *McGrath,* the public school teachers who challenged the statutory amendments in *Parker* had vested rights under their retirement plans prior to the amendments' enactment. 123

F.3d at 4. Thus, the facts in *Parker* closely resemble those in the present case, because just as the school teachers had met the age and service requirements in their pension plans, so too had the correctional officers fulfilled the educational credit requirements of the incentive pay program.

Second, like the statute in the case at bar, the Maine state legislature did not make any express statement as to whether the legislation establishing the pension plan could be amended or altered. *Id.* at 3–4. In other words, unlike in *McGrath*[5] where the legislature specifically reserved the right to amend, alter, or repeal the statute at any time, the statute in *Parker* did not mention whether the pension plan could be amended, altered or repealed. *See McGrath*, 88 F.3d at 14; *Parker*, 123 F.3d at 3–4.[6] Consequently, to the extent the correctional officers had fulfilled the statutory requirements and to the extent the legislature did not expressly reserve the power to amend or repeal the incentive pay program, the facts and corresponding analysis in *Parker* is instructive in resolving the case at bar.

In *Parker*, the First Circuit was faced with the question of whether a statutory amendment that was detrimental to a state employee's retirement pension plan triggered further scrutiny under the Contract Clause when the employee's pension rights had vested prior to the amendment. 123 F.3d at 4. The circuit, however, refused to provide a "blanket answer." *Id.* The inherent tension that exists between the judiciary's desire to protect an individual's contractual rights and its hesitancy to find an implied governmental contractual obligation meant that a simple "yes" or "no" did not sufficiently answer the question posed in *Parker*. *See id.* at 5. The circuit cautioned that a legislature "should not bind future legislatures from employing their sovereign powers in the absence of the clearest of intent to created vested rights protected under the Contract Clause." *Id.* Consequently, the circuit concluded in *Parker* that a close examination of the particular provisions of the state pension program at issue was necessary in order to determine whether the state legislature had intended to create an unmistakable contractual right. *Id.*

The First Circuit has noted that "[n]o single form of wording is essential in order to find a contractual relationship." *R.I. Laborers' Dist. Council v. State of R.I.*, 145 F.3d 42, 43 (1st Cir.1998). Nevertheless, "absent some clear indication that the legislature intends to bind itself contractu-

---

**5.** The Rhode Island statute in *McGrath* stated in relevant part:

> The right to amend, alter, or repeal this chapter at any time or from time to time is expressly reserved, and in that event the liability of the municipal employees' retirement system of Rhode Island shall be limited ... to the contributions made by the member, without interest, and in the case of a municipality, to contributions made by the municipality[,] without interest, subject to deductions prescribed in the case of withdrawal by a municipality....

*McGrath*, 88 F.3d at 14 (quoting R.I. Gen. Laws. § 45–21–47).

**6.** In fact, not only did the statute in *Parker* not specifically say whether the legislature maintained the ability to repeal the law, the Maine legislature eventually enacted an amendment stating that no amendment to the legislation could reduce the benefits due. The statute at the time the First Circuit decided *Parker* read in relevant part:

> No amendment to this Part may cause any reduction in the amount of benefits that would be due to a member based on creditable service, earnable compensation, employee contributions, pick-up contributions and the provisions of this Part on the date immediately preceding the effective date of the amendment.

*Parker*, 123 F.3d at 4 n. 5 (quoting 5 M.R.S.A. § 17801 (1989)).

ally, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985)(internal quotations omitted). Indeed, the primary function of a legislature is to make laws that establish policies for the state rather than to form contracts that would bind future legislatures. *Id.* at 466, 105 S.Ct. 1441. As the Supreme Court has noted, unlike contracts, policies may be freely revised and repealed. *Id.*

In order to distinguish between a contract and a policy, courts utilize the unmistakability doctrine which requires a legislature to "evince a clear ... intent to create private and enforceable contract rights against the state." *Retired Adjunct Professors*, 690 A.2d at 1345. The unmistakability doctrine, therefore, ensures that no power of sovereignty is surrendered unless the surrender is expressed in terms *"too plain to be mistaken." Parker*, 123 F.3d at 5 (emphasis added)(internal quotations omitted). This ensures that one legislature does not hold a future legislature hostage by preventing the future legislature from utilizing its sovereign power unless the legislature which enacted the statute manifested the clearest intent to create rights protected by the Contract Clause. *Id.*

Thus, the Supreme Court has warned courts to "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466, 105 S.Ct. 1441. Heeding this warning, the Rhode Island Supreme Court has eloquently noted that "ships of state from time to time need to reshape or remove the policy barnacles encrusted on their hulls. Otherwise, every statute of benefit to some group or individual would remain immutable and forever crystallized in the past as long as one or more beneficiaries could claim reliance thereon." *Retired Adjunct Professors*, 690 A.2d at 1347.

For its part, however, plaintiff contends that the unmistakability doctrine is not applicable to the case at bar. (Pl. Objection to Motion to Dismiss at 7.) Plaintiff relies heavily on the Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) to support its contention. In what amounted to various convoluted groupings of Justices joining, concurring and dissenting throughout the opinion, a plurality of the Supreme Court held that there was no reason to question the lower court rulings that the federal government had entered into a contract with certain savings and loan thrifts. *Id.* at 862, 865–66, 116 S.Ct. 2432.

In *Winstar*, the Government encouraged healthy thrifts to acquire failing thrifts by permitting the acquiring thrifts to redesignate certain identifiable assets as supervisory goodwill and to count that goodwill along with various capital credits toward the thrifts' regulatory capital reserves. *Id.* at 847–48, 116 S.Ct. 2432.

The dispositive fact in *Winstar* was the existence of a bargained-for exchange between the regulators and the acquiring institutions. As the Supreme Court pointed out, "the accounting treatment to be accorded supervisory goodwill and capital credits was the subject of express arrangements between the regulators and the acquiring institutions." *Id.* at 853, 116 S.Ct. 2432. The Court acknowledged that the extent to which the express agreements departed from prior regulatory norms was not immediately clear, but the Court concluded that "an acquiring institution would

reasonably have wanted to bargain for such [preferential accounting] treatment." *Id.* at 853–54, 116 S.Ct. 2432. In other words, the respondent thrifts would not have sought to acquire the failing thrifts without having bargained for the preferential accounting treatment, because to do so would have risked the respondents' own financial health. *See id.* (explaining that the supervisory mergers were "rational only because of the accounting treatment.") Consequently, the Supreme Court agreed with the Court of Federal Claims and the Federal Circuit that the Government had not merely signed documents which reflected federal regulatory policy at the time, but had instead entered into enforceable contracts with the respondent thrifts. *Id.* at 862, 865–66, 116 S.Ct. 2432.

Furthermore, the Supreme Court concluded that to apply the unmistakability doctrine in *Winstar* would result in a conceptual expansion of the doctrine "beyond its historical and practical warrant . . . [and] would place the doctrine at odds with the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." *Id.* at 883, 116 S.Ct. 2432. As discussed below, applying the unmistakability doctrine to the case at bar, however, would not result in a conceptual expansion of the doctrine nor would it impair the government's ability to contract. Indeed, its application to the case at bar is warranted by existing case law.

Less than a year after the Supreme Court's decision in *Winstar*, the Rhode Island Supreme Court in *Retired Adjunct Professors* utilized the unmistakability doctrine in order to determine whether the Rhode Island General Assembly could constitutionally enact a law changing the amount of part-time state work that retired professors could take on before their

pensions would be suspended. 690 A.2d at 1344. Although the Rhode Island statute at issue in that case involved a pension plan and not an incentive pay program, the case is instructive, because the court's analysis and its determination that the retired professors did not have a contractual right to be re-employed by the State after their retirement served as a stepping stone for Judge Francis Boyle's holding in *Perry.* 975 F.Supp. at 426 (holding that the state court clerks' statute did not create a contract as a matter of federal constitutional law).

The Rhode Island Supreme Court noted that in order for a violation to occur under the Contract Clauses of the United States and Rhode Island Constitutions, a contract must be found to exist. *Rhode Island Adjunct Professors,* 690 A.2d at 1345 n. 2. The Court explained that in order to determine whether a public contract had been formed, the Court must examine the legislature's intent as expressed in the language of the statute. *Id.* at 1346.

In *Rhode Island Adjunct Professors,* the Court determined that the statutes at issue did not contain any "language granting or even referring to any contractual or other right of . . . [the] public pensioners to obtain post-retirement reemployment from the State. And none can be presumed or inferred from the way the statutes are worded." *Id.* at 1345. Thus, even though the professors may have relied on the possibility that the State would extend re-employment offers in the future, the professors should not have concluded that the statute at issue was "fossilized in legislative amber." *Id.*

While this Court recognizes that statutory language is not the sole means by which a court can determine whether a contract has been formed, statutory language nevertheless plays a crucial role. *See NEA I,* 890 F.Supp. at 1151 (explaining that a

statute establishes a contract when the language and circumstances illustrate a legislative intent to create private contractual rights). *See also United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The language of the Incentive Pay Statute is particularly noteworthy not for what it includes, but rather for what it does not include; that is, words associated with contract formation such as, "contract," "acceptance," "consideration" and "reliance" are notably absent. *Perry,* 975 F.Supp. at 424. Indeed, the language of the Incentive Pay Statute closely mirrors the language of the clerks' statute in *Perry.* As is true in the statute currently at issue before this Court,[7] the statutory language in *Perry* included the word "offering."[8] Despite acknowledging that the legislature "undoubtedly knew" that the word "offer" is a legally operative term, Judge Boyle in *Perry* concluded that the statutory language as a whole did not adequately express an intent to bind the State to a public contract. *Id.* at 424, 426. As the language of the statute at issue is virtually identical to that of the statute in *Perry,* this Court likewise concludes that the word "offering" in § 42–56.1–1 does not evince an unmistakable intent on the part of the General Assembly to contract with plaintiff and its Members.

More importantly, the statutory language did not contractually bind the State in *Perry,* because, at the end of the day, the General Assembly offered nothing more than financial *compensation* to the State's court clerks. *Id.* at 424. Although it is useful to analyze an incentive pay program in light of existing pension plan precedent, the fact remains that pensions are not compensation programs; because, once the age and service requirements of a pension plan have been met, the employee's rights vest and cannot be altered. *Id.* The vesting creates binding contractual rights between the employer and the employee. As Judge Boyle pointed out in *Perry,* however, "there is no constitutional right to receive compensation for any amount in public service. A public officer's right to compensation is not based on contract or property rights." *Id.* at 425. Indeed, the law determines what compensation public employees receive, and that compensation is inherently subject to amendment. *Id.* Hence, since the right to educational incentive pay never vests and such pay is merely compensation or wages, incentive pay, like base pay, can be modified by law. *Id.* (citing statutory support in R.I. Gen. Laws § 36–6–5 (1997) which states that "all [state] officials and employees shall be compensated in the manner provided by the annual appropriation act or as may hereafter otherwise be prescribed by law").

Lastly, like the language of the court clerks' statute in *Perry,* the language of the statute here explains that the General Assembly "shall annually appropriate such sums as it may deem necessary to carry

---

7. There is hereby established an educational incentive pay plan in accordance with the provisions hereof, *offering* financial compensation to certain members of the department of corrections for furthering their education so as to improve their professional competency. R.I. Gen. Laws § 42–56.1–1 (emphasis added).

8. The Rhode Island clerks' incentive pay statute stated in relevant part:

There is hereby established an incentive pay program in accordance with the provisions of this chapter *offering* financial compensation to clerks of the supreme, superior, family, and district courts and administrators of the worker's compensation commission for furthering their education in the field of court administration or law enforcement. *Perry,* 975 F.Supp. at 424 (quoting R.I. Gen. Laws. § 8–4.1–1) (emphasis added).

out the provisions of this chapter." R.I. Gen. Laws § 42–56.1–9. This indicates that the "amount of incentive pay is malleable and [that the General Assembly] reserves the right to change the compensation." *Perry*, 975 F.Supp. at 426.

Clearly, the First Circuit has been very hesitant to infer a public contract when a statute does not utilize traditional contractual language nor explicitly prohibits a future legislature from modifying the statute. *See Nat'l Educ. Ass'n–Rhode Island v. Ret. Bd. of the R.I. Employees' Ret. Sys.*, 172 F.3d 22, 27 (1st Cir.1999)("*NEA II* ")(discussing that even in the context of *public* employee pension plans, the courts have been reluctant to infer a contract since legislatures often modify compensation schedules and benefit programs). As the circuit has explained, "it is easy enough for a statute explicitly to authorize a contract or to say explicitly that the benefits are contractual promises, or that any changes will not apply to a specific class of beneficiaries." *Id.* at 27–28. Since the General Assembly did not explicitly authorize a contract nor specify that the benefits are contractual promises, and given that the General Assembly never indicated that changes to the statute would not apply to the correctional officers, this Court concludes that the General Assembly in the Incentive Pay Statute did not evince an unmistakable intent to bind the State contractually. Since the Incentive Pay Statute did not result in the creation of either a bilateral or a unilateral contract, Counts I and IV of the complaint fail to state a claim upon which relief can be granted. Counts I and IV, therefore, must be dismissed.

### C. *The Collective Bargaining Agreement*

■ Neither party disputes that the CBA was a binding contract between plaintiff and the State. The parties disagree, however, as to the date on which the CBA ceased to be enforceable. The CBA by its own terms expired on June 30, 1996. The issue before this Court, therefore, is whether the provisions of the CBA continued to be valid beyond that date.

Article XL of the CBA stated that the agreement would automatically renew unless one party notified the other in writing that the party wished to enter into negotiations in order to modify the agreement. CBA, art. XL, ¶ 40.1. During the period of negotiations, the agreement would remain in full force and continue to be effective until a party gave notice of termination as provided in ¶ 40.2 of Article XL. *Id.* Paragraph 40.2 specifically states that "in the event that either party desires to terminate this Agreement, written notice must be given to the other party not less than ten (10) days prior to the desired termination date." CBA, art. XL ¶ 40.2. Paragraph 40.2 of the CBA further stipulates that the desired termination date cannot precede the agreement's established expiration date. *Id.*

The question, therefore, is whether defendants provided plaintiff with adequate notice of termination. It is evident to this Court that the amendment's enactment, which became effective upon the expiration of the CBA, clearly manifested the State's intent to formally terminate the CBA. As the First Circuit emphasized in *Hoffman v. City of Warwick,* during its discussion of a procedural due process claim, "[w]here the legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and burdens of economic life, in the absence of any substantive constitutional infirmity, 'the legislative determination provides all the process that is due.'" 909 F.2d 608, 619–20 (1st Cir.1990)(quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct.

1148, 71 L.Ed.2d 265 (1982)). The proposed amendment to the incentive pay statute was introduced at the request of Governor Almond as part of a much larger appropriations bill in the House of Representatives on February 15, 1996. H.R. 8783, 1996 Jan. Sess. (R.I.1996). The stated purpose of Article 66, which encompassed the proposed amendment, was to "change the current correctional officer education incentive pay structure form [sic] a percentage based on salary incentive pay to a standard bonus based on the education level attained." *Id.* at art. 66. Although Governor Almond vetoed the appropriations bill on July 18, 1996, the House and Senate overrode the veto that same day. It is evident to this Court that the Governor did not veto the appropriations bill on account of Article 66, since the legislation as enacted encompassed the change to the incentive pay program which the Governor himself had proposed on February 15, 1996. Consequently, the legislative process through the introduction of the bill in February provided plaintiff and its Members with ample notice of the State's intention to terminate the CBA in accordance with the termination provisions of Article XL. As such, the provisions of the CBA were no longer operative as of June 30, 1996.

Yet, even assuming, *arguendo*, that the legislature did not intend to terminate the CBA in its entirety, the portions dealing with the educational incentive pay program conflicted with the new amendment as of July 1, 1996. As the Rhode Island Supreme Court stressed in *State v. R.I. Alliance of Social Services Employees, Local 580*, 747 A.2d 465, 469 (R.I.2000), "neither a department of state government, nor a union of its employees . . . can agree to relieve the parties to a CBA of their obligation to comply with applicable state law because of an inconsistent CBA provision." Consequently, when the amendment to the Incentive Pay Statute went into effect on July 1, 1996, any conflicting provisions of the CBA were thereby void.[9] As such, the amendment to the statute did not constitute a breach of the Collective Bargaining Agreement.

### D. *The Alleged Individual Contracts*

■ As discussed above, the Incentive Pay Statute itself did not bestow upon plaintiff and its Members any contractual rights. Nevertheless, a question remains as to whether the documents signed by the individual Members are enforceable contracts. This Court need not answer this question at the present time, however, because plaintiff does not have standing to bring a breach of contract claim on behalf of the correctional officers regarding their alleged individual contracts.

At oral argument, this Court questioned whether plaintiff has standing to bring individual breach of contract claims on behalf of its Members. Although counsel was unable to provide the citation at the hearing, this Court presumes that plaintiff intended to cite R.I. Gen. Laws § 28-8-1 (2000) as support for its contention that plaintiff has standing to bring suit. The problem with plaintiff's argument, however, is that the statute has been interpreted to grant a union authority to bring suit on behalf of its members for an employer's violation of a *collective bargaining agreement* and then only after securing the *consent* of the individual members. *United Textile Workers v. Lister Worsted Co.*, 91 R.I. 15, 160 A.2d 358, 361 (1960). Plaintiff, therefore, does not have standing to

---

**9.** Since this Court has determined that, as of July 1, 1996, the incentive pay program was no longer in effect, this Court need not con-

sider whether a prior arbitration concerning the educational incentive provisions of the CBA bars the present action.

bring this suit under § 28–8–1 for two obvious reasons.

First, the statutory language states that a union can bring "[s]uits or actions at law for the violation by an employer of contracts of employment." § 28–8–1. At the outset, this language might seem to imply that "contracts of employment" can include individual contracts between an employer and employee. The Rhode Island Supreme Court in *Lister Worsted*, however, has interpreted the language as referring to a collective bargaining agreement. 160 A.2d at 361. The Rhode Island Court concluded that the legislature intended for § 28–8–1 "to authorize the right of the union to sue for the enforcement of the rights of its individual members in their capacity as employees, provided it had prior permission so to do." *Id.* The contract at issue in *Lister Worsted* was a collective bargaining agreement—not individual contracts entered into between the employer and its employees. The Court explained that upon enacting § 28–8–1, the legislature did not intend to "preclude the right of an individual employee to waive or ignore the violation of a contractual obligation to which only he and his employer are privy." *Id.* The court, however, was not referring to an obligation under an individual contract between an employer and an employee, but rather to a contractual obligation under the collective bargaining agreement.

This Court reached the same conclusion in *Trustees of the Local Union No. 17 v. May Eng'g Co. Inc.*, 951 F.Supp. 346, 351 (D.R.I.1997). This writer explained that § 28–8–1 "authorizes a labor organization to sue an employer to enforce the terms of a collective bargaining agreement." *Id.* Thus, § 28–8–1 does not bestow standing upon plaintiff to bring an action for breach of contract on individual agreements entered into between defendant and plaintiff's Members.

█ Furthermore, even if the legislature intended for § 28–8–1 to apply to an individual employment contract between an employer and its employee, plaintiff has failed to allege that it attained its Members' consent to bring suit. *Lister Worsted*, 160 A.2d at 361. The Rhode Island Supreme Court stressed that consent is a prerequisite to bringing suit under § 28–8–1. As plaintiff has failed to allege in its complaint that it sought permission from its Members to bring a breach of contract claim under § 28–8–1, plaintiff lacks standing to do so.[10]

---

**10.** Plaintiff also lacks standing under § 1983 to bring claims on behalf of its Members. Although plaintiff's *Members* may have standing to bring a § 1983 claim seeking injunctive relief against the individual defendants, it is evident that plaintiff itself does not meet the requirements for associational standing in the present case. The First Circuit has recognized that § 1983 does not restrict a plaintiff to asserting only his own rights. *Playboy Enter. Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 32 n. 9 (1st Cir.1990). Indeed, the First Circuit noted that "such a restriction would be contrary to a number of cases which recognize third party and associational standing in § 1983 suits." *Id.* The Supreme Court in *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) stated that an association has standing to sue on behalf of its members when, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." This Court acknowledges that plaintiff's Members would have standing to bring suit in their own right under § 1983, because if their rights under § 1983 have been violated, then they have suffered an actual "injury in fact." *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir.1998). Furthermore, the interests of its Members that plaintiff seeks to protect are germane to the organization's purpose.

*Takings Clause*

■ Count III of the complaint alleges a violation of the Takings Clause.[11] The Takings Clause of the United States Constitution forbids the federal government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V.[12] This prohibition has been extended to the States through the Fourteenth Amendment. *NEA II*, 172 F.3d at 29. The Takings Clause ensures that a state does not impose unwarranted costs on its citizens when the state takes their property for public use. *Perry*, 975 F.Supp. at 426.

■ Although property rights are ordinarily created by state law, *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) federal constitutional law determines whether the alleged interest created by the State rises to the level of "property," thereby securing the protections of the Fifth and Fourteenth Amendments.[13] *Perry*, 975 F.Supp. at 426. While no concrete definition of property has been developed, the concept includes more than simply tangible property. *NEA II*, 172 F.3d at 29. Indeed, intangibles such as trade secrets and a contractual right to payment qualify as

property for constitutional purposes. *Id.* Similarly, a property interest in employment can be created by a statute or by an implied contract. *Perry*, 975 F.Supp. at 427.

The Supreme Court has noted, however, that a "unilateral expectation" does not merit Takings Clause protection even if the expectation is a reasonable expectation of economic benefit. *NEA II*, 172 F.3d at 29(citations omitted). Rather, in order to survive a motion to dismiss, plaintiff must plead sufficient facts which, if true, would give plaintiff a legitimate claim of entitlement to a property interest. *See Perry*, 975 F.Supp. at 427.

The First Circuit has explained that three factors are of particular importance in assessing Takings Clause challenges. A court must determine (1) "the economic impact of the statute on the claimant," (2) the degree to which the statute has interfered with "distinct investment-backed expectations," and (3) the nature of the governmental action. *Hoffman*, 909 F.2d at 617 (internal quotations omitted).

As for the first factor, the First Circuit in *Hoffman*, explained that the economic impact of the statute repealing plaintiffs'

Plaintiff, however, lacks standing to bring suit on behalf of its Members under § 1983, because it has failed to satisfy the third factor in *Hunt*. That is, the claim asserted and the relief requested requires the participation of the individual Members. This Court cannot make a determination in a vacuum. The officers must be present in order for the Court to make a determination as to their individual rights. In addition, an individual finding as to the amount of damages owed each officer necessitates the officers' participation in the lawsuit. Thus, the necessity of their individual presence precludes plaintiff from bringing a § 1983 claim for injunctive relief on the officers' behalf.

11. In Count III of the complaint, plaintiff failed to specify which Takings Clause defendants have purportedly violated. Given that

plaintiff alleged both federal and state constitutional Contract Clause violations and substantive due process claims, this Court will assume that plaintiff intended to allege a violation of the Takings Clause under the Fifth Amendment of the United States Constitution and Article I, Section 16 of the Rhode Island Constitution.

12. The Rhode Island Constitution provides comparable protection in R.I. Const. art. I, § 16.

13. Whether an interest rises to the level of "property" is a question of federal constitutional law for both Takings Clause and federal due process purposes. *Hoffman*, 909 F.2d at 615–619.

preferential employment treatment as returning war veterans did not constitute a taking, because the Repeal Statute "did not deprive them of monetary benefits already paid over." *Id.* As plaintiff in the case at bar has not alleged that the amendment to the Incentive Pay Statute deprived its Members of monetary benefits that had already been paid, plaintiff has failed to allege sufficient facts to satisfy this factor.

With regard to the second factor, the Circuit explained in *Hoffman*, that "since the statute does not deprive plaintiffs of contractual rights, it does not interfere with investment-backed expectations." *Id.* (internal quotations omitted). As Judge Boyle discussed in *Perry*, the court clerks' statute did not create contractual rights, and thus the plaintiffs were not protected by a contract which gave them a right to percentage pay increases. 975 F.Supp. at 427. As such, plaintiffs in that case could not benefit from the "well-established premise that contract rights are protected by the Takings Clause." *Id.* (citing *United States Trust*, 431 U.S. at 19 n. 16, 97 S.Ct. 1505). Since this writer has already determined that the statute presently at issue did not bestow upon plaintiff and its Members any contractual rights, plaintiff has failed to satisfy the second factor.

Lastly, the Circuit noted that the nature of the governmental action in *Hoffman* did not invade or appropriate plaintiffs' assets for the State's own use. 909 F.2d at 618. Rather, by eliminating the veterans' preferential treatment, the legislature simply "made an adjustment of the benefits and burdens of economic life." *Id.* (internal quotations omitted). As was previously discussed, the Rhode Island General Assembly must be free to adjust compensation levels in accordance with its legislative goals and policies. In *Perry*, Judge Boyle concluded that there was "no language in the statute indicating that the level of incentive pay ... [could] not be altered. Nothing in the statute create[d] an entitlement in the plaintiffs to have the incentive pay remain at a fixed level." 975 F.Supp. at 427. Similarly, nothing in the correctional officers' statute indicates that the statute cannot be changed by future legislatures. Consequently, terminating the incentive pay program amounted to nothing more than a decision on the part of the General Assembly to adjust life's economic benefits and burdens.

Thus, the amendment to the Incentive Pay Statute did not deprive plaintiff's Members of a property interest entitling them to Takings Clause protection. *Id.* In sum, without a contract, there is no property right, and without a property right, there is no Takings Clause violation. Since this Court has concluded that the legislature did not intend to bind the State of Rhode Island contractually, plaintiff and its Members have failed to allege sufficient facts which, if true, would support a Takings Clause claim. Therefore, Count III must be dismissed.

*Substantive Due Process*

In Count II of the complaint, plaintiff pleads a substantive due process violation under the United States and Rhode Island Constitutions.[14] This Court can quickly dispense with this count, because just as a Takings Clause claim is

---

**14.** The Due Process Clauses of the United States provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV. The language of the Rhode Island Constitution mirrors the language of the United States Constitution. *See* R.I. Const. art. 1, § 2. The Due Process Clause is intended to "protect[ ] private property interests from arbitrary government action." *Perry*, 975 F.Supp. at 427.

dependent on the existence of a legitimate claim of entitlement, that is, a property right, so too is a due process claim.[15] *R.I. Laborers' Dist. Council,* 145 F.3d at 44 n. 1. Thus, since no property right arose out of any contract with the State, and since the statute itself did not create a property interest, plaintiff's substantive due process claim fails as well. *Perry,* 975 F.Supp. at 427–28. Therefore, Count II must be dismissed.

### Promissory Estoppel

■ Count V of the complaint alleges a claim for promissory estoppel. Plaintiff claims that its Members "justifiably and reasonably relied upon the agreements and promises of the State of Rhode Island and its agents ... to pay percentage based educational incentive funds." (Compl.¶ 38.) Plaintiff further contends that "the defendants should reasonably have expected their promises and agreements ... to induce the reliance of the Members of RIBCO." (*Id.* ¶ 40.) Plaintiff's reliance argument fails, however, because the extent to which plaintiff and its Members relied on the Incentive Pay Statute was unreasonable.

According to Rhode Island state law, a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Mangla v. Brown Univ.,* 135 F.3d 80, 85 (1st Cir.1998)(internal quotations omitted). *See also,* Restatement (Second) of Contracts § 90 (1981). Thus, plaintiff and its Members must not only have relied on the Incentive Pay Statute, they must have *reasonably* relied on it.

As discussed above, the Rhode Island Supreme Court stated that the retired state professors who relied on statutory provisions governing their ability to engage in post-retirement work could not have reasonably concluded that those provisions would forever be "fossilized in legislative amber." *Retired Adjunct Professors,* 690 A.2d at 1345. The Rhode Island Court acknowledged that the professors may have relied on the statute when deciding whether to retire, but for the professors to believe that the legislature would never amend nor revoke the provisions was unreasonable. *See id.*

**15.** Plaintiff argues that even if it lacks a property interest sufficient to gain the protections of the Takings Clause, it nonetheless has pled an interest sufficient to invoke the protections of the Due Process Clauses of the United States and Rhode Island Constitutions. (Pl.'s Obj. Motion to Dismiss at 22). While this Court recognizes that plaintiff is entitled to be protected against arbitrary and capricious governmental action, "the due process standard in economic matters is one of minimum rationality." *NEA II,* 172 F.3d at 30. The question with regard to economic regulation is "not whether the legislature has dealt perfectly with all possible problems but whether its choice ... was rational." *Id.* at 31. It is clear that the Rhode Island General Assembly had a rational legislative purpose in "avoiding the unanticipated potential for financial calamity" that could result from a restriction placed on its ability to amend state employee compensation programs due to changing economic conditions. *Hoffman,* 909 F.2d at 618. As the Rhode Island Supreme Court stated in *Retired Adjunct Professors,* the legislature must have a "free hand not only to grapple with changes in the State's financial condition but also to wrestle with new and pressing practical considerations beyond those that reigned supreme when the subject statute was enacted." 690 A.2d at 1346. Thus, since plaintiff has failed to allege facts sufficient to support a finding that there exists no rational relationship between the regulation and a legitimate governmental objective, it is clear that the State's actions under the present circumstances satisfy rational basis review. *Diaz v. United States Postal Service,* 853 F.2d 5, 10 (1st Cir.1988).

The Court further stressed that "notions of promissory estoppel that are routinely applied in private contractual contexts are ill-suited to public-contract-rights analysis." *Id.* at 1346. Thus, whether the correctional officers would have a viable claim for promissory estoppel had they been employed in the private sector is not for this Court to decide. What is clear for present purposes, however, is that a legislature must be free to adjust the pay schedules of state employees as warranted by changing economic conditions. As a result, for plaintiff and its Members to have presumed that the Rhode Island General Assembly would never revisit the issue of educational incentive pay was simply unreasonable. Consequently, Count V of the complaint must be dismissed for failure to state a claim upon which relief can be granted.

*Unjust Enrichment and Quantum Meruit*

■ Count VI of the complaint alleges a claim for unjust enrichment and quantum meruit. In Rhode Island, the equitable doctrine of unjust enrichment may apply in the absence of an enforceable contract in order "to prevent a person from retaining a benefit received from another without appropriate payment." *Doe v. Burkland,* 808 A.2d 1090, 1095 (R.I.2002). The unjust enrichment doctrine is applicable when "it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another." *Merchants Mut. Ins. Co. v. Newport Hosp.,* 108 R.I. 86, 272 A.2d 329, 332 (1971). In order to recover under a theory of unjust enrichment, a plaintiff must prove that (1) a benefit has been conferred upon the defendant by the plaintiff, (2) the defendant appreciated the benefit, and (3) defendant accepted the benefit in a manner in which it would be inequitable for the defendant to retain that benefit without

paying for it. *Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997) (citations omitted).

Plaintiffs have pled sufficient facts to satisfy the first and second factors. The State of Rhode Island likely knew that it benefitted from the additional skills and knowledge the correctional officers had attained. Plaintiff, however, has not pled sufficient facts to satisfy the third factor, because, as discussed above, it is clear that Rhode Island may rescind, amend or alter an educational incentive program. Thus, it is not inequitable for Rhode Island to continue to benefit from the correctional officers' increased knowledge and skills.

Furthermore, the equitable remedy of unjust enrichment is not appropriate here, because the doctrine presupposes that if plaintiff were left without a remedy, plaintiff would suffer a net loss. That is, defendant would have received a benefit "at the expense of" plaintiff. *Merchants Mut. Ins.,* 272 A.2d at 332. In the present case, however, plaintiff has not alleged sufficient facts which would support a finding that plaintiff and its Members have suffered a net loss on account of pursuing their education. While this Court does not discount the fact that plaintiff's Members expended time and resources in pursuing further education, the Members have undoubtedly benefitted from those advanced degrees. The correctional officers gained additional knowledge and skills which they can utilize throughout their professional careers. Thus, plaintiff has not pled sufficient facts to support the conclusion that the hardships the officers incurred as a result of enrolling in the courses were not offset by the educational benefits they received. In essence, the alleged facts, viewed in the light most favorable to the plaintiff, do not support a finding that plaintiff and its Members suffered a net loss as a matter of

law. Consequently, Count VI must be dismissed.[16]

### III. Conclusion

Since plaintiff has failed to state a viable federal or state claim in the complaint, defendants' motion to dismiss is granted as to all counts.

The clerk shall enter judgment for all defendants forthwith.

It is so ordered.

---

16. Plaintiff's quantum meruit claim is quasi-contract in nature and "is a close cousin to the equitable remedy of unjust enrichment." *Commercial Associates v. Tilcon Gammino, Inc.,* 998 F.2d 1092, 1100 (1st Cir.1993). In Rhode Island, "actions brought upon theories of unjust enrichment and quasi contract are essentially the same." *Bouchard,* 694 A.2d at 673(internal quotations omitted). As a result, plaintiff's quantum meruit claim fails as well.