# United States Court of Appeals
## For the First Circuit

No. 13-1933

MAINE ASSOCIATION OF RETIREES; SALLY MORRISSEY; DOROTHY DAVIS;
CATHERINE RICHARD; PAUL LYNCH; MAINE STATE EMPLOYEES ASSOCIATION;
RONA BACKSTROM; KATHLEEN KADI; ROBERT RUHLIN,

Plaintiffs, Appellants,

MAINE EDUCATION ASSOCIATION; ROBERT WALKER; PHILIP GONYAR; MAINE
STATE TROOPERS ASSOCIATION; CRAIG POULIN; TIMOTHY CULBERT,

Plaintiffs,

v.

BOARD OF TRUSTEES OF THE MAINE PUBLIC EMPLOYEES RETIREMENT
SYSTEM; PETER M. LESLIE, individually and in his official
capacity as Chairman for Board of Trustees of the Maine Public
Employees Retirement System; BENEDETTO VIOLA, individually and in
his official capacity as Vice Chairman for Board of Trustees of
the Maine Public Employees Retirement System; CATHERINE R.
SULLIVAN, individually and in her official capacity as member for
Board of Trustees of the Maine Public Employees Retirement
System; RICHARD T. METIVIER, individually and in his official
capacity as member for Board of Trustees of the Maine Public
Employees Retirement System; GEORGE A. BURGOYNE, individually and
in his official capacity as member for Board of Trustees of the
Maine Public Employees Retirement System; KENNETH L. WILLIAMS,
individually and in his official capacity as member for Board of
Trustees of the Maine Public Employees Retirement System; NERIA
DOUGLASS, individually and in her official capacity as Treasurer
for Board of Trustees of the Maine Public Employees Retirement
System; BRIAN H. NOYES, individually and in his official capacity
as Treasurer for Board of Trustees of the Maine Public Employees
Retirement System,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, <u>U.S. District Judge</u>]

Before

Thompson, <u>Circuit Judge</u>,
Souter,[*] <u>Associate Justice</u>,
and Stahl, <u>Circuit Judge</u>.

---

<u>James T. Kilbreth</u>, with whom <u>George Royle V</u>, <u>Drummond Woodsum</u>, <u>Jeffrey Neil Young</u>, <u>Carol J. Garvan</u>, and <u>McTeague Higbee</u> were on brief, for appellants.
<u>Timothy C. Woodcock</u>, with whom <u>Adria Y. LaRose</u> and <u>Eaton Peabody</u> were on brief, for appellees.
<u>Gregory G. Katsas</u>, <u>Craig I. Chosiad</u>, and <u>Jones Day</u> on brief for <u>Maine Heritage Policy Center</u>, amicus curiae.

---

June 27, 2014

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL, Circuit Judge**.  Plaintiffs appeal from the district court's grant of summary judgment on their claims that certain amendments to Maine's public employee retirement system violate the Contract and Takings Clauses of the United States Constitution.  After careful consideration, we affirm.

## I.  Facts & Background

Plaintiffs are the Maine Association of Retirees and the Maine State Employees Association (and several individual members of each).[1]  The district court also certified the following class:

> All retired State of Maine employees and public school teachers whose final termination of service occurred before June 20, 2011, and who had become eligible to receive service retirement benefits from the Maine Public Employees Retirement System no later than that date.

Defendants are the Board of Trustees of the Maine Public Employees Retirement System and individual officers and members thereof, named in both their individual and official capacities. Plaintiffs allege that their contractual rights were impaired by certain amendments to the Maine Public Employees Retirement System (MePERS) that had the effect of decreasing the cost-of-living adjustments (COLAs) they otherwise would have received under the pre-amendment law.

---

[1] The Maine Association of Retirees and its individual members filed the initial complaint.  The Maine State Employees Association, the Maine State Troopers Association, and the Maine Education Association, along with individual members of each, successfully moved to intervene as plaintiffs.  Of this latter group, only the Maine State Employees Association and its individual members are parties to this appeal.

The district court provided a thorough review of the legislative history of MePERS and its predecessors, see Me. Ass'n of Retirees v. Bd. of Trs. of Me. Pub. Emps. Ret. Sys., 954 F. Supp. 2d 38, 41-46 (D. Me. 2013), and we need not repeat it here to answer the narrow question before us: whether Plaintiffs have a contractual right to cost-of-living adjustments calculated according to pre-2011 law. We confine our recitation to those facts necessary to resolve this particular question.

Maine state employees and public school teachers are required to be members of MePERS during their employment, Me. Rev. Stat. tit. 5, § 17651, and they do not participate in Social Security. An employee who works the required number of years qualifies, upon retirement, to receive a pension that is calculated by reference to his length of service and compensation. Id. §§ 17851, 17852.

Maine's public employee retirement system has taken various forms over the several decades after it was first created exclusively for teachers in 1913, but, for our purposes, we can begin in 1965, when COLAs were first introduced. Me. Pub. L. 1965, ch. 337, § 4. Under that provision, retirees were awarded a one-time percentage increase based on the effective date of their retirement allowance, with any future adjustments mirroring adjustments to salaries of active state employees. In 1975, the following provision was added:

> Effect on accrued benefits.  No amendment to this chapter
> shall cause any reduction in the amount of benefits which
> would be due to the member based on creditable service,
> compensation, employee contributions and the provisions
> of this chapter on the date immediately preceding the
> effective date of such amendment.

Me. Pub. L. 1975, ch. 622, § 6.  The Legislature also adopted a provision stating that a member's retirement allowance would be determined according to the law in effect on the later of the date of termination of service or January 1, 1976.  Id. § 48.

Two years later, the Legislature amended the system to reflect that, after a six-month waiting period, all retirees would receive annual, compounding COLA increases or decreases, matching the percentage change in the Consumer Price Index (CPI), up to a maximum of four percent.  Me. Pub. L. 1977, ch. 573, § 3.  This amendment also provided that, notwithstanding any COLA adjustments, "the amount of annual retirement allowance otherwise payable under this chapter shall not be less than the retired member received on the effective date of his retirement or on July 1, 1977, whichever is greater."  Id.  Thus, while a negative CPI could, in effect, take back prior COLA increases, the allowance could never go below the floor set by the initial base amount.

Then, in 1985, the laws governing the retirement system were revised in several ways.  First, the 1975 provision governing accrued benefits was retitled "Amendment not to cause reduction in benefit" and was slightly modified:

-5-

No amendment to this Part may cause any reduction in the amount of benefits which would be due to a member based on creditable service, compensation, employee contributions and the provisions of this Part on the date immediately preceding the effective date of the amendment.

Me. Pub. L. 1985, ch. 801, § 5, codified as amended at Me. Rev. Stat. tit. 5, § 17801.[2]  Following the parties' and the district court's terminology, we will refer to this provision as "Former Section 17801."  The provisions covering COLAs were codified at Me. Rev. Stat. tit. 5, § 17806, without substantive change.  The provision specifying the applicable law was retitled "Law governing benefit determination," and amended to read: "[i]f a member's final termination of service occurred on or after January 1, 1976, the retirement system law in effect on the date of termination shall govern the member's service retirement benefit."  Id. § 17853(1).[3]

In 1997, this court held that Maine's statutory scheme did not evince an unmistakable intent to create private contractual rights with respect to teachers who had not yet begun receiving pension benefits, and therefore an amendment that reduced their expected pension benefits did not violate the Contract Clause. Parker v. Wakelin, 123 F.3d 1, 2 (1st Cir. 1997).  In direct

_____

[2] This provision was amended again in 1987 in ways not material to this appeal.  See Me. Pub. L. 1987, ch. 739, § 25.

[3] The retirement benefit of members whose service terminated before that date would be governed by the law as of January 1, 1976.  Id. § 17853(2).

response to this ruling,[4] the Legislature repealed Former Section 17801 and replaced it with a provision that establishes that certain enumerated protections "constitute solemn contractual commitments of the State protected under the contract clauses of the Constitution of Maine, Article I, Section 11 and the United States Constitution, Article I, Section 10, under the terms and conditions set out in subparagraph (2)."  Me. Pub. L. 1999, ch. 489, § 3, codified at Me. Rev. Stat. tit. 5, § 17801(1)(B). Subparagraph (2) specifies that the contractual commitment attaches when the member satisfies the applicable creditable service requirement.  Id. § 17801(1)(B)(2).  The enumerated provisions all relate either to the eligibility qualifications for particular benefits or to the computation of those benefits.  Id. § 17801(1)(B)(1).  Among these provisions is subsection (4) of Section 17806, which states that the twelve-month waiting period to begin receiving COLAs may not be increased.  The subsections governing all other aspects of COLAs are not included on this list. Subsection (2) specifies that the commitment set out in subsection (1) applies only to those enumerated provisions, and that "[a]ny provision not specifically identified in subsection 1 may be

_____

[4] See Labor Cmte. Amendment A to H.P. 189, L.D. 267 (May 20, 1999) ("The amendment is intended to specifically supplant the holding of the United States Court of Appeals for the First Circuit in [Parker] with respect to retirement benefits listed in the amendment from the time those benefits attach as provided in the amendment.").

increased, decreased, otherwise changed or eliminated by the Legislature as to any member regardless of whether the member has or has not met any creditable service requirement for eligibility to receive a service retirement benefit." Id. § 17801(2). Finally, subsection (4) provides that, at any time before a member has satisfied the creditable service requirement, "the Legislature may increase, decrease, otherwise change or eliminate any provisions of this Part." Id. § 17801(4).

In 2009, the Legislature passed emergency legislation, entitled "An Act To Protect Benefits for State Retirees," amending Section 17806 to provide that, in the event of a negative CPI, the Board would set the COLA at zero percent rather than decreasing the amount to be paid. 2009 Me. Legis. Serv. ch. 433, § 2, codified at Me. Rev. Stat. tit. 4, § 1358(1)(A-1).[5] The stated purpose for this amendment was to ensure "that the benefits for state retirees are protected." Id.

In 2011, the Maine Legislature amended the statutes governing calculation of COLAs in two pertinent ways. First, it prohibited COLA payments for 2011, 2012, and 2013, 2011 Me. Legis. Serv. ch. 380, § T-21, subject to conditions that would allow non-cumulative COLA payments each of those years if sufficient funds

_____

[5] This provision was slightly revised, but not substantively changed in any relevant sense, the following year. See 2010 Me. Legis. Serv. ch. 473.

remained in the retirement benefit reserve fund,[6] id. § T-22. Second, it reduced the maximum COLA from 4% to 3%, and provided that the adjustment would apply only to the first $20,000 of the retirement benefit. Id. § T-10. While the financial impact of these changes for any individual retiree depends on multiple factors (the annual CPI, the amount of the retiree's pension benefit, and how many years of payments are made to the retiree or his beneficiary), in general, retirees stand to be paid significantly less as a result of the amendments.[7]

The district court divided its analysis into two parts, focusing first on individuals who retired after the 1999 amendment to Section 17801. It held that the plain language of Section 17853 ("[T]he retirement system law in effect on the date of termination shall govern the member's service retirement benefit.") meant that Section 17801, rather than Former Section 17801, applied to them.

---

[6] Under this provision, the beneficiaries did receive a one-time, non-cumulative COLA payment in 2012. The record does not reflect whether this also occurred in 2013.

[7] Defendants admitted Plaintiffs' statement of material facts in its entirety for the purposes of the summary judgment motion. With their statement, Plaintiffs submitted the declaration of John Wakefield, formerly an employee of the Maine Legislature's Office of Fiscal and Program Review, in which he calculated losses under various assumed scenarios. For example, assuming a COLA of 2.85% (matching the average CPI from 1983 to 2010), a retiree with a $20,000 pension benefit would lose $42,364 over twenty years compared to pre-amendment law. Changing the pension benefit to $50,000 results in a loss of $256,607 over twenty years. If the COLA were 4%, these losses would be $111,096 and $436,923, respectively.

<u>Me. Ass'n of Retirees</u>, 954 F. Supp. 2d at 50–51. The district court concluded that those retirees were "entitled only to the 'solemn contractual commitments' contained in the current version of Section 17801." <u>Id.</u> at 50. Because the provisions for calculating COLAs were not on that list, they fell squarely within the Legislature's reservation of the right to "increase[], decrease[], otherwise change[] or eliminate[]" any non-enumerated provision regardless of whether the member has satisfied the creditable service requirement. <u>Id.</u> at 51 (quoting Me. Rev. Stat. tit. 5, § 17801(2)). As for those individuals who retired under Former Section 17801, the district court, reading the statutory scheme as a whole, held that the Legislature did not unmistakably intend to create contractual rights to COLAs as calculated under pre-amendment law. <u>Id.</u> at 51–54. This appeal followed.

## II. Analysis

Our review of the district court's grant of summary judgment is de novo. <u>Ardente</u> v. <u>Standard Fire Ins. Co.</u>, 744 F.3d 815, 817 (1st Cir. 2014). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. "Although the wording of the Contract

Clause appears uncompromising[,] . . . the Supreme Court does not interpret it as an absolute bar on the impairment of either governmental or private contractual obligations." Parker, 123 F.3d at 4.  The analysis proceeds in two steps.  First, we ask "whether a change in state law has resulted in the substantial impairment of a contractual relationship." Id. at 4-5 (internal quotation marks omitted).  If so, we next inquire whether the impairment nevertheless "is reasonable and necessary to serve an important public purpose." U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 25 (1977).  By agreement of the parties, only the first step was before the district court, and so it is here.

The first inquiry itself "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992).  A party alleging that contractual rights arose from a statutory enactment faces a heavy burden: "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66 (1985) (internal quotation marks omitted); see also Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100 (1938)

-11-

("The principal function of a legislative body is not to make contracts but to make laws which declare the policy of the state and are subject to repeal when a subsequent Legislature shall determine to alter that policy."). The question is one of federal, rather than state, law, Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys., 173 F.3d 46, 60 (1st Cir. 1999), although we "accord respectful consideration and great weight to the views of the [s]tate's highest court," Romein, 503 U.S. at 187 (internal quotation marks omitted).

A statute will be found to have created contractual obligations "when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." U.S. Trust, 431 U.S. at 17 n.14; see also Nat'l R.R., 470 U.S. at 466 ("[T]o construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body."). "This threshold requirement for the recognition of public contracts has been referred to as the 'unmistakability doctrine.'" Parker, 123 F.3d at 5. This requirement "serve[s] the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." United States v. Winstar Corp., 518 U.S. 839, 875 (1996) (plurality opinion).

We have said that this unmistakable intent may be shown where the statute uses the language of contract, "expressly authoriz[ing] a contract or expressly stat[ing] that benefits are contractual." Parella, 173 F.3d at 60. A statute that "expressly bars future amendments that would reduce benefits already granted" may also satisfy the unmistakability doctrine. Id. "But [the] analysis cannot end with the bare language of the statute, since a clear and unequivocal intent to contract can also be demonstrated by circumstances." Id. at 61; see also R.I. Bhd. of Corr. Officers v. Rhode Island, 357 F.3d 42, 46 n.3 (1st Cir. 2004) ("[A] litigant seeking to overcome the hurdle of the unmistakability doctrine may rely on not only the words used [in the statute] but also apparent purpose, context, and any pertinent evidence of actual intent, including legislative history . . . .") (second alteration in original) (internal quotation marks omitted).[8] On the other hand, an explicit reservation of the right to alter, amend, or repeal particular statutory provisions -- "hardly the language of

_____

[8] The Maine Law Court appears to have taken a narrower view, holding that contractual rights can arise only when the statute "used express language to create contractual rights." Budge v. Town of Millinocket, 55 A.3d 484, 490 (Me. 2012); see also Spiller v. State, 627 A.2d 513, 515–17 (Me. 1993) (holding that Maine's retirement system law did not create contractual rights as to employees who had not yet satisfied the creditable service requirement because no "intent to do so [was] clearly stated"); id. at 517–20 (Wathen, J., dissenting) (criticizing majority's apparent adoption of an "iron-clad requirement" that "the statute expressly state[] that it is a contract" as overly simple and blind to relevant factors). As will be seen, any difference in standards is immaterial to the resolution of this appeal.

contract," Nat'l R.R., 470 U.S. at 467 -- will generally demonstrate the opposite intent with respect to the provisions and classes of people within the reservation's scope.

Finally, we note that the same searching inquiry must be made "both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." Id. at 466.

With this framework in mind, we turn to the specific provisions here at issue. We begin with the pre-1999 retirees, whose retirement benefits, pursuant to Section 17853, are governed by Former Section 17801. As Plaintiffs have argued, several aspects of the statutory framework, legislative history, and surrounding circumstances strongly suggest that the Legislature intended to prohibit future legislatures from reducing these retirees' pension benefits. Whether these aspects are sufficient to render that intention unmistakably clear is a question we leave for another day; for now, like the district court, we assume that MePERS creates some contractual obligation and focus instead on whether COLAs are included in that obligation.

We start, as we must, with the statutory language: "No amendment to this Part may cause any reduction in the amount of benefits which would be due to a member based on creditable service, compensation, employee contributions and the provisions of this Part on the date immediately preceding the effective date of

the amendment." Former § 17801. Plaintiffs assert that, since the COLA provisions are "provisions of this Part," they necessarily are protected against Legislative reduction. However, the protection extends only to <u>benefits</u> that are based on the "provisions of this Part," and we cannot say that COLAs unmistakably fall within the umbrella of benefits that Former Section 17801 protects.

Plaintiffs point out that "benefit" is statutorily defined in relevant part as "any payment made, or required to be made, to a beneficiary under chapter 423, subchapter V," Me. Rev. Stat. tit. 5, § 17001(6),[9] and chapter 423, subchapter V, in turn, includes the COLA provisions in Section 17806. Defendants, on the other hand, note that the Legislature has always distinguished the pension benefit from cost-of-living adjustments to that benefit, adjustments that are speculative and contingent on extra-system factors (specifically, the change in the CPI). <u>See</u> Me. Pub. L. 1965, ch. 337, § 4 (referring to COLAs as "[a]djustments in the retirement allowances"); Me. Pub. L. 1977, ch. 573, § 3 (directing Board to "automatically make . . . adjustments in the retirement allowances" based on the CPI). Section 17806 itself is entitled "[c]ost-of-living adjustment to retirement benefits." Moreover, in

---

[9] "Retirement allowance" and "retirement benefit" appear to be used interchangeably with "benefit." <u>See</u> Me. Rev. Stat. tit. 5, § 17001(34) ("'Retirement allowance' means the retirement payments to which a member is or may be entitled as provided in this Part."), (35) ("'Retirement benefit' means the same as retirement allowance.").

-15-

setting the retirement-date pension amount as the floor below which a negative CPI could not reduce the allowance, Me. Pub. L. 1977, ch. 573, § 3(D), the Legislature arguably treated the base pension amount as the benefit, protected against deflationary reduction, and COLA increases as potentially temporary adjustments to that benefit.[10]  Defendants thus argue that COLAs are not "benefits" within the meaning of Former Section 17801.

Either characterization of COLAs is possible.  In the context of the unmistakability doctrine, this ambiguity dooms Plaintiffs' argument.  See Parker, 123 F.3d at 9 (holding that, even if plaintiffs proffered a "possible reading" of the statute and "some evidence" that a contractual right attaches when a member satisfies the creditable service requirement, "the language of section 17801 remains at best ambiguous, and we cannot find that the legislature as a whole unmistakably intended to create contract rights at the time that service requirements were satisfied").  Because it is not unmistakably clear that COLAs fall within the umbrella of benefits that (we have assumed) the Legislature is

---

[10] It is true that, in 2009, the Legislature passed an emergency amendment directing the Board to set the COLA at zero percent in the event of a negative CPI, thus treating COLAs as a one-way ratchet, to ensure "that the benefits for state retirees are protected."  This enactment sheds no light on the intentions of the earlier legislatures, especially insofar as it does not purport to clarify that earlier provisions did not allow for COLA decreases, but rather overrides those provisions allowing such decreases.

-16-

contractually obligated not to reduce, the pre-1999 retirees cannot prevail on their Contract Clause claim.[11]

We turn now to the post-1999 retirees.  Section 17801, as amended, plainly and expressly creates a contractual commitment to the retirees to whom it applies.  See Parella, 173 F.3d at 60 ("Statutory language, standing alone, may evince such an intent if it expressly authorizes a contract or expressly states that benefits are contractual.").  Just as plainly, that commitment is limited to certain enumerated provisions, with the Legislature expressly reserving the right to modify, or even eliminate, any non-enumerated provision.  See Nat'l R.R., 470 U.S. at 467 (noting that reservation of right to amend "is hardly the language of contract").  Through the operation of Section 17853, this version of Section 17801 applies to anyone who retired after its effective date.  We thus have no difficulty concluding that Section 17801 affords post-1999 retirees no contractual right to COLAs (except with respect to the length of the waiting period).

Plaintiffs attempt to avoid this result by arguing that subsection (2)'s reservation of the right to alter any non-enumerated provision "as to any member" means that no such reservation was made as to them, as they ceased being "members" when they retired and became "beneficiaries."  They argue that

_____

[11] In light of this conclusion, we need not address the district court's discussion of the meanings of the terms "reduction" and "due" as used in Section 17806.

-17-

Section 17801 was meant to protect against alteration of certain benefits as to current, vested employees, and had no impact on retirees' rights that "were already protected under Parker."  In light of Section 17853, it is difficult to see how post-1999 retirees could benefit from whatever protections Former Section 17801 provides, given that that section was "repealed and replaced" in 1999.  But even if Plaintiffs are right, our holding that pre-1999 law created no contractual right to COLAs would apply with equal force to post-1999 retirees supposedly protected by pre-1999 law.

We hold that Plaintiffs, regardless of whether they retired before or after the 1999 amendments, have no contractual entitlement to COLA benefits calculated under pre-2011 law.  Therefore, the 2011 amendments did not violate the Contract Clause.[12]

_____

[12] It is not clear whether Plaintiffs press their Takings claim on appeal.  They request reversal of the District Court's dismissal of their Contract Clause and Takings Clause claims, but develop no separate argument under the Takings Clause.  The claim is, therefore, waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  In any event, the finding that Plaintiffs have no contractual right to COLAs forecloses the Takings claim.  See Parella, 173 F.3d at 59 ("Only if we determine that plaintiffs had a constitutionally protected contract right to the excess benefits can we consider whether the state took that contract right without just compensation.").

### III. Conclusion

For the foregoing reasons, we <u>affirm</u> the district court's grant of the Defendants' motion for summary judgment.  All parties shall bear their own costs.